IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. ___12-10995-AA,___
___12-15248-AA,___
___12-15027-AA___

United States of America,

Appellee,

- versus -

Lamont Flanders, Jr.,
Emerson Callum,

Appellants.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

BRIEF FOR THE UNITED STATES

Wifredo A. Ferrer
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9114

Kathleen M. Salyer
Chief, Appellate Division

Emily M. Smachetti
Assistant United States Attorney

Lisa Tobin Rubio
Assistant United States Attorney

Of Counsel

**United States v. Lamont Flanders, Jr. and Emerson Callum,**
**Case No. 12-10995-AA, 12-15248-AA, 12-15027-AA**

**Certificate of Interested Persons**

Undersigned counsel for the United States of America hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case who were not included in the Certificate of Interested Persons set forth in appellant's brief:

Altman, Roy

Bandstra, Hon. Ted. E.

Brown, Hon. Stephen T.

Butler, Thomas John

Callum, Emerson

Dunham, Christian Scott

Farina, Vincent Peter

Ferrer, Wifredo A.

Flanders, Jr., Lavont

Goodman, Hon. Jonathan

Joffe, David Jonathon

Kent, William Mallory

Kuhl, Kenny F.

Lewis, Derek Vaughn

Lyons, Anne M.

**United States v. Lamont Flanders, Jr. and Emerson Callum,
Case No. 12-10995-AA, 12-15248-AA, 12-15027-AA**

**Certificate of Interested Persons (cont'd)**

Martinez, Barbara A.

Moore, Hon. K. Michael

Powell, Brandine Ellen

Rubio, Lisa Tobin

Salyer, Kathleen M.

Schultz, Anne R.

Smachetti, Emily M.

Spivach, Michael David

Tenne, Gina

Torres, Hon. Edwin G.

Walkins, Arimentha

*/s/ Lisa Tobin Rubio*
Lisa Tobin Rubio
Assistant United States Attorney

**Statement Regarding Oral Argument**

The United States of America respectfully suggests that the facts and legal arguments are adequately presented in the briefs and record before this Court and that the decisional process would not be significantly aided by oral argument.

**Table of Contents**

**Page:**

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  c-1

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xv

Statement of the Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of the Case:

     1.     Course of Proceedings and Disposition in the Court Below .. . . . . .  1

     2.     Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

          A.  The Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

          B.  Searches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

               1.  2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

               2.  2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

          C.  Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

          D.  Victims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

               1.  Irene Heron (Counts 2-3). . . . . . . . . . . . . . . . . . . . . . .  11

               2.  Anja Tyler (Counts 4-6). . . . . . . . . . . . . . . . . . . . . . . .  14

               3.  Sarah Bray (Counts 7-9). . . . . . . . . . . . . . . . . . . . . . .  17

               4.  Casique Smith (Counts 10-11). . . . . . . . . . . . . . . . . . .  18

**Table of Contents**

**(continued)**

**Page**:

     5.  Shanese Caldwell (Count 12). . . . . . . . . . . . . . . . . . . . . . .  22

     6.  Lucrese Williams (Counts 14-15). . . . . . . . . . . . . . . . . . .  24

     7.  Laiken Harris (Counts 16-18). . . . . . . . . . . . . . . . . . . . .  26

  3.    Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Argument and Citations of Authority:

I.    The Evidence Was Sufficient to Support Flanders' Convictions.. . . . . . .  34

    A.  Conspiracy (Counts 1, 13).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

        1.  Agreement to Defraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

        2.  Over Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

    B.  Sex Trafficking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

        1.  Recruitment/Enticement and Fraud. . . . . . . . . . . . . . . . . . .  40

        2.  Credibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

    C.  Benefitting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

    D.  Drugs (Counts 5, 8, 12, 17). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

II.   Flanders Waived His Attacks on the Indictment. . . . . . . . . . . . . . . . .  54

    A.  Grand Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

    B.  Drug Counts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

# Table of Contents

## (continued)

**Page**:

III.  The Government Did Not Commit Prosecutorial Misconduct.. . . . . . . .  57

    1.  Brady Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

    2.  Closing Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

IV.  The Court Did Not Abuse its Discretion in Admitting Evidence.. . . . . .  61

    A.  Internet Searches and Drugs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

    B.  Flander's Post-Arrest Statements. . . . . . . . . . . . . . . . . . . . . . . . . . .  65

    C.  2011 Search Warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66

V.  Appellants Were Not Denied a Public Trial. . . . . . . . . . . . . . . . . . . . . . .  68

VI.  Flanders' Ineffective Assistance Argument Should Not Be Considered.  71

VII.  Flanders Was Not Entitled to Grand Jury Disclosure.. . . . . . . . . . . . . .  71

VIII.  Appellants' Sentences Were Proper. . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

    A.  Sentencing Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

    B.  Sentencing Issues.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79

        1.  Erroneous Citation to §2G1.3(d). . . . . . . . . . . . . . . . . . . . . . . . .  79

        2.  Cross-Reference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

        3.  Double Counting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  82

        4.  Upward Departure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  83

        5.  Substantive Reasonableness. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  85

# Table of Contents

## (continued)

**Page**:

      6.  Downward Variance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87

      7.  Consecutive Life Sentences. . . . . . . . . . . . . . . . . . . . . . . . .  88

      8.  Double Jeopardy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  91

IX.    Flanders' Forfeiture Appeal Should Be Dismissed. . . . . . . . . . . . . . . .  92

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  96

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

v

## Table of Citations

**Cases:**                                                                 **Page:**

*Anderson v. Hardman,*

  241 F.3d 544 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

*Bank of Nova Scotia v. United States,*

  487 U.S. 250, 108 S. Ct. 2369 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

*Blockburger v. United States,*

  284 U.S. 299, 52 S. Ct. 180 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  91

*Brady v. Maryland,*

  373 U.S. 83, 83 S. Ct. 1194 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

*Chavez v. Secretary,*

  647 F.3d 1057 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

*Douglas v. Wainwright,*

  739 F.2d 531 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70

*GJR Invs. v. Country of Escambia, Fla.,*

  132 F.3d 1359 (11th Cir. 1998), *overruled on other grounds,*

  129 S.Ct. 1937 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

*Gall v. United States,*

552 U.S. 38, 128 S. Ct. 586 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79

*Grant v. Cuellar,*

59 F.3d 523 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

# Table of Citations

## (continued)

**Cases:**                                                                          **Page:**

*Harmelin v. Michigan*,

    501 U.S. 957, 111 S. Ct. 2680 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Henderson v. United States*,

    133 S. Ct. 1121 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Judd v. Haley*,

    250 F.3d 1308 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Massaro v. United States*,

    538 U.S. 500, 123 S. Ct. 1690 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Neder v. United States*,

    527 U.S. 1, 119 S. Ct. 1827 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Old Chief v. United States*,

    519 U.S. 172, 117 S. Ct. 644 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Presley v. Georgia*,

    558 U.S. 209, 130 S. Ct. 721 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Tarter v. Hury*,

    646 F.2d 1010 (5th Cir. UnitA 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Aisenberg*,

    358 F.3d 1327 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 73

**Table of Citations**

**(continued)**

<u>**Cases:**</u>                                                                    <u>**Page**</u>**:**

*United States v. Archdale*,

   229 F.3d 861 (9th Cir. 2000)........................................ 83

*United States v. Baker*,

   432 F.3d 1189 (11th Cir. 2005)..................................... 30

*United States v. Bennett*,

   368 F.3d 1343 (11th Cir. 2004), *vacated on other grounds*,

   543 U.S. 1110, 125 S.Ct. 1044 (2005). ............................. 57

*United States v. Bobb*,

   577 F.3d 1366 (11th Cir. 2009)..................................... 91

*United States v. Calderon,*

   127 F.3d 1314, 1325 (11th Cir. 1997), *modified on other grounds*,

*United States v. Toler*,

   144 F.3d 1423 (11th Cir. 1998)..................................... 31

*United States v. Camacho-Ibarquen*,

   410 F.3d 1307 (11th Cir. 2005)..................................... 83

*United States v. Castro*,

   455 F.3d 1249 (11th Cir. 2006)..................................... 31

## Table of Citations

## (continued)

**Cases:**                                                                                    **Page:**

*United States v. Cotton*,

    535 U.S. 625, 122 S. Ct. 1781 (2002)................................. 56

*United States v. Covington*,

    565 F.3d 1336 (11th Cir. 2009)..................................... 90

*United States v. Dulcio*,

    441 F.3d 1269 (11th Cir. 2006)..................................... 54

*United States v. Ellisor*,

    522 F.3d 1255 (11th Cir. 2008)..................................... 31

*United States v. Evans*,

    476 F.3d 1176 (11th Cir. 2007)..................................... 89

*United States v. Exarhos*,

    135 F.3d 723 (11th Cir. 1998)...................................... 74

*United States v. Farley*,

    607 F.3d 1294 (11th Cir. 2010)..................................... 89

*United States v. Fernandez*,

    136 F.3d 1434 (11th Cir. 1999)..................................... 58

*United States v. Fontenot*,

    483 F.2d 315 (5th Cir. 1973)....................................... 39

ix

## Table of Citations

## (continued)

**Cases:**                                                                    **Page:**

*United States v. Ford*,

   34 F.3d 992 (11th Cir. 1994)...................................... 67

*United States v. Frank*,

   599 F.3d 1221 (11th Cir. 2010)................................... 81

*United States v. Glover*,

   686 F.3d 1203 (11th Cir. 2012)................................... 31

*United States v. Gonzalez*,

   550 F.3d 1319 (11th Cir. 2008)................................... 79

*United States v. Hernandez*,

   433 F.3d 1328 (11th Cir. 2005)................................... 30

*United States v. House*,

   684 F.3d 1173 (11th Cir. 2012)................................... 59

*United States v. Howard*,

   953 F.2d 610 (11th Cir. 1992).................................... 66

*United States v. Irey*,

   612 F.3d 1160 (11th Cir. 2010)................................ 79, 88

*United States v. Izurieta*,

   710 F.3d 1176 (11th Cir. 2013)................................... 56

x

**Table of Citations**

**(continued)**

<u>**Cases:**</u>                                                                                                    <u>**Page**</u>**:**

*United States v. Jennings*,

   280 Fed.Appx. 836 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

*United States v. Kersey*,

   130 F.3d 1463 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

*United States v. Kumar*,

   617 F.3d 612 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

*United States v. Lopez*,

   271 F.3d 472 (3rd Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

*United States v. Masilotti*,

   495 Fed.Appx. 975 (11th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93

*United States v. Mastrangelo*,

   733 F.2d 793 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   91

*United States v. McGarity*,

   669 F.3d 1218 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

*United States v. Mechanik*,

   475 U.S. 66, 106 S. Ct. 938 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

*United States v. Merrill*,

   513 F.3d 1293 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30, 65

xi

**Table of Citations**

**(continued)**

**Cases:**                                                                **Page:**

*United States v. Moss*,

   379 Fed.Appx. 651 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92

*United States v. Moriarty*,

   429 F.3d 1012 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89

*United States v. Navarro*,

   608 F.3d 529 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

*United States v. Poole*,

   878 F.2d 1389 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

*United States v. Procter&Gamble*,

   356 U.S. 677, 78 S. Ct. 983 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

*United States v. Quincoces*,

503 Fed.Appx. 800 (11th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii

*United States v. Ramirez*,

   324 F.3d 1225 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 54, 55

*United States v. Register*,

   678 F.3d 1262 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*United States v. Ross*,

   33 F.3d 1507 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66

**Table of Citations**

**(continued)**

**Cases:**                                                                                          **Page:**

*United States v. Suescun*,

  237 F.3d 1284 (11th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Talley*,

  431 F.3d 784 (11th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*United States v. Thomas*,

  242 F.3d 1028 (11th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Thompson*,

  422 F.3d 1285 (11th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Webb*,

  665 F.3d 1380 (11th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*United States v. White*,

  663 F.3d 1207 (11th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Woodard*,

  531 F.3d 1352 (11th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Yousef*,

  327 F.3d 56 (2nd Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Waller v. Georgia*,

  467 U.S. 39, 104 S. Ct. 2210 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## Table of Citations

## (continued)

**Cases:**                                                                  **Page:**

*Williams v. McNeil*,

  557 F.3d 1287 (11th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92


**Statutes & Other Authorities:**                                          **Page:**

18 U.S.C. §371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. §1591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. §1594. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. §2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

18 U.S.C. §3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

18 U.S.C. §3500. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

18 U.S.C. §3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

18 U.S.C. §3584. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  90

21 U.S.C. §841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. §1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Fed.R.App.P.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii, 92

Fed.R.App.P. 28. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

Fed. R. App.P 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  96

Fed.R.Crim.P. 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

**Statutes & Other Authorities (cont'd):**                                          **Page**:

Fed.R.Crim.P. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

Fed.R.Crim.P. 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54, 67

Fed.R.Crim.P. 52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55, 93

Fed.R.Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

Fed.R.Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Fed.R.Evid. 1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66

Fed.R.Evid. 1004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66

Fed.R.Evid. 1003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Southern District of Florida in a criminal case.  The district court entered judgment against Emerson Callum on February 22, 2012 (DE172), and amended the judgment to include restitution on April 26, 2012 (DE224).  Callum timely appealed his conviction and sentence on February 24, 2012 (DE177).  The district court entered judgment against Lavont Flanders on February 21, 2012 (DE170), and amended the judgment on May 25, 2012, to include restitution (DE239).  Flanders timely appealed his conviction and sentence on February 22, 2012 (DE174). Fed.R.App.P. 4(b)(1)(A)(i), (b)(2). *United States v. Quincoces*, 503 Fed.Appx. 800, 802 (11th Cir. 2013) (notice of appeal filed timely after judgment ripens upon award of restitution).

xv

Case No. 12-10995-AA is Flanders' and Callum's appeals of their convictions and sentences.

The district court entered a final order of criminal forfeiture on August 28, 2012 (DE263). Flanders filed a *pro se* notice of appeal which was docketed on September 24, 2012, but was signed on September 20, 2012 (DE266). Even assuming that the notice was placed in the prison mail on the day it was signed, it was outside the 14-day limit and was untimely. Fed.R.App.P. 4(b)(1)(A)(i), (c)(1). Case No. 12-15027-AA is Flanders' appeal of the forfeiture order.

The district court denied Flanders' post-trial motion for disclosure of grand jury materials on September 26, 2012 (DE268), and he timely appealed that order on October 9, 2012 (DE272). Fed.R.App.P. 4(b)(1)(A)(i). Case No. 12-15248-AA is Flanders' appeal of the denial of his motion for grand jury transcripts.

The district court had jurisdiction to enter the judgments pursuant to 18 U.S.C. §3231. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 and authority to examine appellants' challenges to their sentences pursuant to 18 U.S.C. §3742(a).

xvi

**Statement of the Issues**

1.    Whether the evidence sufficiently supported Flanders' convictions.

2.    Whether Flanders waived attacks on the indictment.

3.    Whether the government committed prosecutorial misconduct.

4.    Whether the court properly admitted evidence.

5.    Whether appellants were denied a public trial.

6.    Whether Flanders' ineffectiveness arguments should be considered.

7.    Whether Flanders was entitled to grand jury disclosure.

8.    Whether appellants' sentences were proper.

9.    Whether Flanders' forfeiture appeal should be dismissed.

**Statement of the Case**

**1.    <u>Course of Proceedings and Disposition in the Court Below</u>**

A 20-count superseding indictment charged appellants with conspiracy and substantive sex trafficking of women (18 U.S.C. §§371, 1591, 1594), and Flanders with narcotics distribution (21 U.S.C. §841), based on their scheme to fraudulently lure women to South Florida, drug them with Benzodiazepines, film them engaging in sexual acts, and distribute the pornographic footage (DE71).[1]

---

[1]    As the government later proffered at sentencing, this indictment was but a snapshot of appellants' scheme, which victimized at least 50 identifiable women (DE217:68-80; DE149:8).

Count 1 charged a §371 conspiracy (May2006-July2007), to commit sex trafficking by fraud. Substantive offenses committed during this conspiracy were: §1591(a)(1) sex trafficking by fraud (Counts 2 (Irene Heron), 4 (Anja Tyler), 7 (Sarah Bray), 10 (Casique Smith)); and §1591(a)(2) benefitting by participating in a venture that commits sex trafficking by fraud (Counts 3 (Heron), 6 (Tyler), 9 (Bray), 11 (Smith)) (*id.*).

Count 13 charged a §1594(c) conspiracy (May2010-August2011) to commit sex trafficking by fraud.[2]  Substantive offenses committed during this conspiracy were: §1594(a) attempted sex trafficking by fraud (Counts 14 (Lucrese Williams), 16 (Laiken Harris)); and §1594(a) attempted benefitting by participating in a venture that commits sex trafficking by fraud (Counts 15 (Williams), 18 (Harris)) (*id.*).[3]

Flanders alone was charged with §841 distribution of Alprazolam ("Xanax")[4] (Counts 5 (Tyler), 8 (Bray), 12 (Shanese Caldwell), 17 (Harris)) (*id.*).

---

[2]    The Count 1 conspiracy predated §1594(c)'s enactment in 2008; hence the conspiracy counts charge different statutes.

[3]    The government did not present Reba Williams' testimony, and Counts 19-20 were dismissed (DE213:269).

[4]    Alprazolam, commercially sold as "Xanax" is one of a category of drugs called Benzodiazepines, which also includes Diazepam, Clonazepam and Rohypnol ("Roofies") (DE211:96-99).

2

The jury returned guilty verdicts (DE132-33).  The court sentenced Flanders (DE170,239) and Callum (DE172,224) above the advisory guideline range (262-327 months), to total imprisonment terms of life, life terms of supervised release, appropriate assessments, and $6,714.35 in restitution.

**2.    Statement of Facts**[5]

**A.    The Scheme**

Flanders, a South Florida bus-driver, spent countless hours searching for women on social-networking websites such as Modelmayhem.com[6] and Blackplanet.com.  Usually using a woman's name, he contacted the victims via email, expressed interest in their "look," informed them about a potentially lucrative modeling opportunity, and promised to put them in touch with a "modeling scout" (DE209:52-55,159,164-65;   DE210:81-86,183-91;   DE211:156-58,216,219-20; DE212:10-18).[7]  Once the women provided their telephone numbers, Flanders, using different aliases and blocked phone numbers, called them, falsely purporting to be a

---

[5]    At Flanders' request, we filed a binder containing trial exhibits, including DVDs, in the district court.

[6]    Modelmayhem takes the place of a modeling agency and is used for legitimate modeling jobs, not those involving pornography (DE209:139-42).

[7]    Evidence corroborated the victims' testimony (*e.g.,* DE213:177-79; GX182,193P (explaining the link between Flanders and the alias "Karen Watson" and references to liking the victims' "look")).

modeling scout for well-known legitimate companies such as Bacardi or Olympic Models[8] and offering to audition them in South Florida, usually instructing them to come alone (DE209:55-60,91,162-66; DE210:85-89,186-97; DE211:158-60,219-25,232; DE212:18-27; DE213:264-65).[9]

When the women arrived in South Florida, Flanders explained that they would need to act out a scene for a commercial before they could be taken to a second man, later identified as Callum, to film test footage.  With seemingly legitimate explanations, Flanders usually conducted the rehearsal in a public parking lot late at night (DE209:173,189-95; DE210:97-98,200-01; DE211:161-62; DE212:30-36). Flanders convinced women that the auditions, usually for Bacardi, required them to taste alcohol, say scripted lines, and repeat the several times (DE209:69-74,180-88; DE210:97-103,202-11; DE211:162-65,235-41; DE212:37-42).  Unbeknownst to the women, the alcohol was laced with Alprazolam (DE209:137-38,156-57; DE210:175-

---

[8]    Flanders was never affiliated with these companies (DE213:264-65; GX1).

[9]    The government introduced phone and computer records that corroborated numerous online searches on Modelmayhem and Olympicmodels, and Flanders' telephonic and email contacts with victims and use of aliases (*e.g.* DE213:29-41,61-82,90-96,110-14,120-21,185-201,214-46; GX174,176,178,180,182,191-92,193).  Some of the summary exhibits documenting this evidence are attached as AppendixA.

77; DE211:213; DE212:6-7,71-72), a type of Benzodiazepine that is considered a "date rape" drug because it impairs memory and reduces inhibitions (DE211:94-154).

As Flanders drove them to another location to meet Callum, whom they thought was the Bacardi subcontractor/agent, victims became dizzy, groggy, and often "blacked out" (DE209:74-77,189-92; DE210:104-05,211-17; DE211:165; DE212:43-46).[10] Appellants had them sign Model Release Forms (DE209:87-89,131-32,192-95,222-24; DE212:54-56). The women remembered little, as they helplessly fell unconscious, waking momentarily only to realize that Callum was having sex with them or had his penis in their mouths while Flanders video-recorded. When they regained consciousness the following day in their cars or hotel rooms, they were disoriented, confused, and sometimes unable to walk, covered in vomit and urine, or bleeding vaginally (DE209:77-83,189-97,242-43; DE210:106-12,220-22; DE211:167-70,242-47; DE212:46-57).

Victims Tyler, Caldwell, Williams, and Harris tested positive for Callum's DNA, recovered from vaginal swabs. Other victims' DNA was not tested. Victims

---

[10]    Evidence showed a pattern of phone contact between Flanders and Callum during this time (DE213:202-10; GX180A-G).

5

Heron, Tyler, Bray, Caldwell, and Harris tested positive for Benzodiazepines (DE209:137-38,156-57; DE210:175-77; DE211:213; DE212:6-7,71-72; GX1,194).[11]

Flanders continued to lie to victims after the assaults, communicating with them by telephone and/or email, still pretending to be a legitimate modeling scout, adding to their confusion.  He laid blame for events on the victims, pretending that nothing happened (for example, telling Ms.Harris that her lip was bruised biting into a hamburger and that she was "hallucinating"), and even sent a package to police (using an alias) and reporting Ms.Harris missing (DE209:199-202; DE211:60; DE212:57,156-57,164-66; DE213:237-40), which the jury could infer was intended to disassociate himself from her attack.

Unbeknownst to the victims, Callum (a/k/a/"Jah-T"), distributed (Heron, Tyler, Bray, Smith), and attempted to distribute (Williams, Harris), videos of the assaults, edited to remove portions where they were obviously unconscious, over the internet and to local businesses through his pornographic production company, Miami Vibes Enterprises (DE210:297-98,321-26; DE211:10,27-28; DE212:8-19,25; DE213:123-39,174-75).

---

[11]    An exhibit summarizing the lab reports (GX194; DE247) is attached as AppendixB.

6

### B.    Searches[12]

In the midst of their scheme, in 2007, appellants were arrested by state police, and their residences were searched pursuant to warrants. Both were released on bond and continued their scheme until their arrests in 2011 following searches pursuant to new warrants.

### 1.    2007

In Flanders' bedroom in a residence he shared with two adult relatives, officers discovered victims' pornographic videos, including Ms.Tyler's (GX41:"MonkeyHumpin'#1") and Ms.Heron's (GX42:"EelMakeEmSqueal#1") (DE210:292-98). In the single bathroom, officers found a prescription codeine pill bottle containing eight Diazepam pills and three codeine pills (DE210:299-301).

Flanders waived *Miranda* rights, stated that he was a bus-driver, denied working for Bacardi or Paramount, denied knowing Callum or Miami Vibes, and denied meeting anyone at an IHOP restaurant (although officers knew he had met Ms.Caldwell there) (DE210:302-19; DE211:69-71).

In Callum's office, officers observed hundreds of pornographic photos on the walls. They seized thousands of pornographic videos, including hundreds of copies

---

[12]    Summary exhibits cataloging evidence by location and victim are attached as AppendixC (DE213:141-44,150-51; GX168,169A-G).

of Ms.Heron's (GX48), Ms.Tyler's (GX50A) and Ms.Smith's (GX50D:"MiamiCumShottas#1") videos, and nude photos of Ms.Bray (GX50G-H:"CumSlut&Pretty") (DE210:319-26; DE211:9-15). Officers found raw footage of Ms.Smith which included portions in which she fell asleep during the sexual encounter, which images were not included in the commercial copy. Even the raw footage was not a complete representation of the encounter between Ms.Smith and Callum because the filming stopped and started (DE211:9-13,212; GX50E-F).

In Callum's residence, officers found hundreds of inserts for, and commercial copies of, Ms.Heron's (GX57-59) and Ms.Smith's (GX53,62,64) videos and hundreds of inserts for Ms.Tyler's video (GX60), Model Release Forms for Ms.Caldwell and Ms.Smith, copies of the video-interview of Ms.Heron (GX56) and evidence that Callum paid for the artwork on Ms.Smith's video (DE211:15-28).

## 2.    2011

From a residence Flanders shared with his girlfriend Lucenda Roper and her sister Tammy German, officers seized four computers and memory devices, a cellphone, a camera, numerous videos of victims Williams, Heron, Smith, and Tyler (some packaged for sale), Model Release Forms for victims Heron, Harris, Williams, Smith, Tyler, and a copy of Ms.Harris's student ID (DE212:167-82; DE213:201). Officers also found a package containing letters from Flanders to HomeGrownVideo

revealing that Flanders was attempting to sell pornographic video-footage of Callum and several young women, including Ms.Williams (DE212:182-88;GX159A).  On a nightstand, officers found a bottle containing 19 Clonazepam pills prescribed for Tammy German (DE212:173,190-93; DE213:201-02).

Analysis of recovered computers showed that Flanders used them to email victims and conduct hundreds of searches of Modelmayhem and searches for images of unconscious women (ex. "Roofiepicsofpassedoutgirls," "passedoutgirlgetsfucked," and "sleepfucks") (DE213:71-74,82-87,96-99,110-18).

In Callum's residence, officers seized over 100 boxes, including sales receipts for victims' videos, victims' Model Release Forms, and hundreds of victims' DVDs (commercial and master copies), and DVD cover inserts (DE212:194-206; DE213:8-19,25,29-37).  Also found was a handwritten note indicating that Ms.Caldwell's footage was filmed at a Miami motel (DE213:19).

### C.    Expert Testimony

Dr.Greenblatt, a pharmacology expert on Benzodiazepines (including Alprazolam("Xanax"), Diazepam, Clonazepam and Rohypnol ("Roofies")), testified to their effects (DE211:79-99).  A normal dosage causes drowsiness, sedation, decreased anxiety, slower motor responses, and anterograde amnesia, meaning that information learned while under the drug's influence could be recalled only briefly

9

and then would be erased. The individual might appear normal and be able to answer questions but would have impaired memory. Benzodiazepines are considered a date-rape drug because they make the individual more sexually compliant, disinhibited, and suggestible, allowing the victim to be coaxed into something they might not normally do, with little or no recollection (DE211:94-105,111-13,133-34,151-53). As an example, Dr.Greenblatt described his own dramatic experience after taking a Benzodiazepine similar to Xanax to reduce his anxiety before a plane flight. Although he flew from L.A. to N.Y., took a taxi to another airport, flew to Boston, and arrived safely at his office, he had absolutely no memory of the journey (DE211:105-07).[13]

Dr.Greenblatt watched the victims' videos and opined that their behavior and appearance was consistent with Benzodiazepine influence despite no discernable impairment, although the videos *alone* were insufficient to conclude that the women had ingested Benzodiazepines. He explained that once someone had ingested the drug, it was more likely that some behavior would be related to the drug–their judgment process would be impaired despite normal discourse and appearance, and

_____

[13]    S.A.Carpinteri and Det.Fletcher, both of whom had experience investigating drug-facilitated sex crimes, also testified that it was not unusual for victims to appear awake and engaged yet have little memory of their experiences while drugged (DE 211:62-63; DE213:182-83).

later they would have absolutely no memory of what transpired.  An individual's

consent would be "procedural" if she were under the influence of Benzodiazepines

(DE211:113-17,139-53).

Various factors affect how someone reacts to Benzodiazepines, and in liquid

form or mixed with alcohol, the effects are magnified (DE211:103-04,110-11,122,

137).  Benzodiazepines are highly soluable in liquid, meaning they rapidly dissolve

and remain stable and effective (DE211:110,117).

### D.    Victims

#### 1.    <u>Irene Heron</u> (Counts2-3)

In mid-2006, Ms.Heron was a 24-year-old serving in the Army.  She was

contacted via Blackplanet.com by "Tish," who complimented her "look" and stated

that Bacardilive.com was looking for models.  After confirming that there was a

model named Tish on the Bacardilive.com website, Ms.Heron provided her phone

number and  received a call from "Antone Cobe," whom Ms.Heron later identified as

Flanders, offering an audition for a job worth $94,000/year advertising a new Bacardi

drink.  He explained that as part of the audition, she would need to taste the Bacardi

(DE209:157-70,177,204; DE210:24,66;GX193A).

Ms.Heron traveled to South Florida, and Flanders picked her up at her hotel

around midnight, giving excuses for the late hour and telling her she would later meet

a "subcontractor" who would film the actual audition. Flanders' appearance and statements suggested to Ms.Heron that he was a legitimate modeling scout (DE209:173-78; DE210:66).

Flanders drove Ms.Heron to a building where Callum's business was located, and he retrieved two airplane-sized bottles of alcohol from inside the building, explaining that they would practice the audition in the parking lot (DE209:179-82). Ms.Heron had never been to a modeling shoot before, and she believed Flanders' explanations (DE209:186; DE210:66). After giving Ms.Heron her lines, Flanders poured the alcohol into small plastic cups while Ms.Heron walked away at his instruction. As part of the performance, she consumed two shots, which tasted unusual (DE209:182-88). Flanders then drove Ms.Heron to another building in the same office plaza, telling her not to be intimidated by the pictures on the walls (DE209:189-91).

Flanders led her to an office and introduced a man, later identified as Callum, as the "subcontractor" (DE209:190-92; DE210:61,70). By this time, Ms.Heron felt woozy, and her vision was blurry. She observed pornographic pictures on the wall and she recalled Callum handing her a form, which she signed, although she did not recall what it said and her name was misspelled (DE209:191-94,197; GX52). Ms.Heron recalled trying to stand up, and then falling back down on the couch,

12

prompting Callum to comment that she was "tipsy" (DE209:195). The next thing Ms.Heron remembered was seeing Callum naked, seeing a tripod, and then passing out. When Ms.Heron regained consciousness, Callum was putting his penis into her mouth. Video-footage showed appellants mocking Ms.Heron for never having "sucked dick before," and Callum ejaculating on her face (DE209:195-97;DE210:25-27; GX190B). Ms.Heron did not agree to these sex acts but was incapable of objecting (DE210:68-69).

Ms.Heron did not remember anything else until she woke up in her hotel room, feeling "out of it" and fatigued. She did not remember how she got there or how she got dressed (DE209:197-98). She rushed to catch her flight home, and she later reported to a rape treatment center. Ms.Heron's urine tested positive for Alprazolam, although she had never knowingly ingested that drug (DE209:195-96; DE210:44-49,67,175-76; GX1).

Ms.Heron did not agree to, or remember having, sexual intercourse with Callum, did not know a video was being sold until the prosecutors told her, and did not remember taking nude photographs (DE209:188-89,192,196-97,205-08; DE210:25-28; GX50C).

After returning home, Ms.Heron received a phone call from Flanders, still using the alias "Antone," telling her that the video-footage had been erased. She also

received an email from "Tish," whom she still believed was real, telling her the "subcontractor" loved her. Ms.Heron angrily responded to both that something had been put in her drink (DE209:199-202).

### 2.  __Anja Tyler__ (Counts 4-6)

In August 2006, Ms.Tyler was a 25-year-old single mother (DE210:72-76). She was contacted via her Blackplanet.com profile by "Shannon," who offered to refer Ms.Tyler to a modeling agent who worked for Paramount Films through OlympicModel agency and would "love [her] look." Shannon's Blackplanet profile appeared to support Shannon's representations (DE210:77-86;GX193C).

Ms.Tyler provided her number and received a call from "Larry Griffin," whom Ms.Tyler later identified as Flanders. He claimed to be a scout for Olympic, recruiting a model for a Bacardi commercial worth $90,000-$160,000. Flanders explained that she would need to drink some Bacardi as part of the audition. Flanders' statements seemed serious and credible, and they never discussed nudity or pornography (DE210:86-95,107,118-20,169-70;GX193B).

Ms.Tyler drove to South Florida, and met Flanders at a gas station. He explained that before they could meet the Bacardi agent, she had to practice her lines and film some test footage at another location. Ms.Tyler agreed accompany Flanders because he seemed legitimate (DE210:91-98,141). Flanders eventually took her to

14

a closed restaurant parking lot.  He had several airplane-sized Bacardi bottles in a brown bag.  Using his car's hood as a bar, Flanders instructed Ms.Tyler to approach, request a shot of Bacardi, and walk away (DE210:98-103).  Flanders took each bottle out of the bag, opened it, and handed it to her, and Ms.Tyler drank straight from the bottles (DE210:103-05,144-45).

As Flanders drove Ms.Tyler to an office building where Callum's business was located, she felt dizzy and passed out repeatedly despite trying to stay awake.  She had difficulty walking into the building, and her vision was blurry (DE210:103-08,122-23).  At the office, a man, later identified as Callum, introduced himself as the Bacardi agent and said that she could be selected to model in a Bacardi commercial (DE210:108-09,120-22,173).  Ms.Tyler saw pornographic photos on the wall and wanted to run, but her body was "frozen," and she passed out (DE210:109,124).  The next thing she remembered was Callum naked on top of her, they were having sexual intercourse, and Flanders was filming.  After a few seconds, she passed out again, waking to realize that Callum was having her perform oral sex, before blacking out again (DE210:109-11).

When Ms.Tyler next awoke, she was in the back of Flanders' car.  She did not remember how the sex ended, how she got dressed, or how she got into his car (DE210:111-12).  Flanders acted as though nothing had happened, telling her that the

15

Bacardi agent would call her.  Ms.Tyler surreptitiously dialed 911 twice but did not speak because she feared Flanders would kill her.  Flanders dropped Ms.Tyler off at her car.  Although she was still dizzy, she wrote down Flanders' license plate number and called 911 again (DE210:113-17).

The police took Ms.Tyler to a rape treatment center (DE210:117-18) where her vaginal swab tested positive for Callum's DNA, and her urine tested positive for Alprazolam (DE210:176-77; GX1), although she had never knowingly ingested that drug (DE210:104-05).

Several years later, Ms.Tyler learned via Facebook message that a pornographic video of her sexual encounter with Callum was available on the internet (DE210:127-29; GX50A).  In the video, appellants laughed as they made comments about liking her "look" similar to those she received in Shannon's email (DE210:129-30,174).  Ms.Tyler did not remember the events depicted in the video (DE210:130-31).  She  believed that she screamed and resisted, but this did not appear on the edited video (DE210:150,172-73).  Ms.Tyler never agreed to be filmed having sex or gave anyone permission to sell pornographic footage of her (DE210:132,174).

Ms.Tyler identified the handwriting and signature on a Model Release Form as hers, but she did not remember signing it (DE210:124-26; GX53).

16

### 3.    **Sarah Bray** (Counts 7-9)

In November 2006, Ms.Bray was a 19-year-old virgin (DE211:155-56,170-71,199-200). She was contacted via her Blackplanet.com profile by "Maria" who told her about a modeling opportunity and said that she had a good "look"[14] (DE211:156-58). After Ms.Bray provided her phone number, she received a call from a modeling scout, whom she later identified as Flanders, offering work in modeling/music videos. They did not discuss pornography, nudity, or sex (DE211:158,166-67,173-74).

Pursuant to Flanders' instructions, Ms.Bray met him at a restaurant, and he explained that he would take her to film a commercial-type video. Believing that he was a legitimate modeling scout, Ms.Bray drove with him to an open lot. Flanders had an airplane-sized Bacardi bottle which he poured into a cup. At his instruction, Ms.Bray drank the alcohol, said a few lines, and then walked away, repeating the process several times (DE211:161-65). At one point, Ms.Bray turned around and saw Flanders shaking the bottle (DE211:164).

The next thing Ms.Bray remembered was waking up somewhere else and seeing a building. She passed out, awaking again to find a man, later identified as Callum, on top of her, but she blacked out within seconds (DE211:165,167,175,193).

---

[14]    The transcript erroneously uses the word "luck" instead of "look" (DE211:158).

17

Ms.Bray remembered nothing else until she woke up in her car dizzy, with vaginal pain (DE211:168-70). She called a friend who drove her home. She was "freaking out" and after seeing blood in her underwear, she went to bed. Later, Ms.Bray went to the hospital. When interviewed by police, she not disclose the full story, preferring to "go home and go to sleep and forget it ever happened" (DE211:170-72,198-99,210,212).

Ms.Bray's urine tested positive for Benzodiazepines (DE211:213; GX1), although she had never knowingly ingested that drug (DE211:166).

Ms.Bray identified her signature on a Model Release Form, but did not remember having seen it before and did not use the stage name "Pretty" written on the form (DE211:175-77; GX54). She did not remember taking nude photos (GX50H2), and she only learned there was a videotape of her sexual encounter when prosecutors told her. Ms.Bray did not remember answering questions on the video or anything else, including portions showing appellants laughing at Ms.Bray's virginity as Callum's semen dripped down her face (DE211:177-81,212; GX164).

### 4. <u>Casique Smith</u> (Counts10-11)

In March 2007, Ms.Smith was a 32-year-old substitute teacher, personal trainer, and aspiring model (DE210:178-84). "Karen Watson" contacted her via Modelmayhem.com, said she liked her "look," suggested that she could make a lot

18

of money in high-end modeling, and offered to have a scout contact her. Karen suggested that Ms.Smith "visit us" at Olympicmodels.com (DE210:184-86;GX182,193C). The website looked legitimate, and Ms.Smith provided her phone number. "Darius," whom Ms.Smith later identified as Flanders, called her, introduced himself as the scout Karen Watson had mentioned, offered a test shoot for a Bacardi/Smirnoff commercial, and explained that a "subcontractor" would ultimately determine whether she got the job worth $54,000. Flanders instructed her to bring small Bacardi and Smirnoff bottles for her audition to sample as part of the audition (DE210:186-99,243-44;GX193D).

After Ms.Smith arrived, she met Flanders at an office parking lot after 10 p.m. Flanders seemed professional. He instructed her to walk toward the camera, take a drink of alcohol, say a line, and then walk away without looking back. Using his car's hood as a bar, Flanders poured the alcohol Ms.Smith had brought into a shot glass. They repeated this process several times, and then Flanders said it was time to meet the subcontractor (DE210:199-211). Ms.Smith put the empty Bacardi bottle in her car and asked Flanders for the Smirnoff bottle so she could dispose of it properly. Flanders repeatedly refused to give it to her and ultimately threw it into the parking lot, shattering the glass (DE210:212-13,262-64).

19

By this time, Ms.Smith was feeling woozy and felt very passive. She kept dozing-off in Flanders' car, felt dizzy, and had difficulty controlling her body (DE210:213-17).

They went to a motel room where Flanders and the subcontractor, later identified as Callum, both separately said that "Karen Watson" wanted them to film a love scene, which Ms.Smith did not want to do (DE210:217-20,224,244-45). Ms.Smith did not remember taking off her clothes, but she remembered sitting on the bed naked. Callum, also naked, asked her to perform oral sex on him, which Ms.Smith did. She felt very passive and did whatever they told her (DE210:220,273). Callum had sexual intercourse with Ms.Smith while Flanders filmed, but Ms.Smith only recalled parts. She did not remember answering questions on camera, but recalled that when Callum was done, he relieved himself on her face (DE210:220-22). Ms.Smith recalled trying to push Callum off her, but her "hands just fell from his thighs," even though she is normally very strong (DE210:221, 281). She also recalled seeking Flanders' assistance as he filmed, but he responded, "This is what Karen Watson wants" (DE210:220-22). Ms.Smith neither recalled answering questions on the video, nor appellants laughing at her as Callum instructed her to say hi to Karen and when, as Callum ejaculated on her face, she could not keep herself awake (DE210:247-48,280-82;  DE213:177-79;  GX50C).     Flanders  did  not  film

20

continuously, and the commercial video was edited to exclude some things visible on the raw footage (DE210:221-22; DE211:11-13). Ms.Smith believed she resisted but the footage was edited out (DE210:250-51).

Ms.Smith did not remember anything else until she woke up in Flanders' car the next morning, still felling groggy and lethargic. She got into her car and drove slowly back to where she was staying and went to bed for several hours, before driving home to Orlando, still feeling unusual and sluggish (DE210:226-28).

Ms.Smith contacted Flanders by phone and sent multiple emails, expressing outrage that Flanders had filmed Callum assaulting her, and trying to gather additional information to give authorities. During these conversations, Flanders maintained his ruse in an apparent effort to appease Ms.Smith (DE210:227-41; GX31:A-F).

Though scared and confused, Ms.Smith ultimately reported the incident to the Miramar police a week later. She still had the Bacardi bottle, and gave it to police because she suspected that there was something in her drink. Police located a single glass shard from the Smirnoff bottle that Flanders had smashed in the parking lot. Neither tested positive for drugs, although Flanders' fingerprints were on the Bacardi bottle (DE210:236-43,280-90).

Ms.Smith identified her handwriting on a Model Release Form but did not remember signing it (DE210:222-24,286; GX61).  She did not recall taking nude photographs (DX210:225-26; GX132B), and was not aware that footage was being sold as adult pornography until 2010 when a Facebook friend told her (DE210:244-46).  She never would have agreed to be filmed having sex had she been in her right mind, but she was very passive and unable to leave (DE210:211,246-47,265,273,288).  Based on her reactions, she believed she had been drugged (DE210:280-85).

### 5.   <u>Shanese Caldwell</u> (Count12)

In mid-2007, Shanese Caldwell was a 20-year-old student and aspiring model. "Karen Watson" contacted her via Modelmayhem.com about a modeling job in South Florida, saying that she represented Bacardilive.com and loved her "look" (DE209:52-58).  After viewing the website, which looked legitimate, and providing her phone number, Ms.Caldwell received a call from "Darius Cove," later identified as Flanders, who said he was a scout for the person picking Bacardilive models, and he described the audition process (DE209:57-62,67,90-91,134-35; GX182,193C,193F).

Ms.Caldwell drove to Miami, arriving after midnight, and Flanders instructed her to meet him in an IHOP restaurant parking lot (DE209:65-69).  Flanders

explained that for the audition, she would drink some Bacardi alcohol he had brought, say a line after tasting the drink, and then walk away while he filmed. After she did this several times, Flanders told her she could meet the recruiter who would make the ultimate decision on the models (DE209:69-75,130,136).

Ms.Caldwell recalled nothing else until she woke up the next day in her car in the IHOP parking lot. Her clothing was disheveled as though someone else had dressed her, she was covered with vomit and urine, she had an unusual amount of moisture between her legs, she could not walk, her speech was extremely slurred, and she felt very bad. She did not remember having sex or meeting anyone other than Flanders (DE209:77-83,91-92,100-01,133). When shown a Model Release Form in her name, Ms.Caldwell testified that it was not her handwriting or signature (DE209:87-89,113,131-32;GX55).

A photographer whom Ms.Caldwell was supposed to meet later that morning found her and called police (DE209:85-87,141-46). Her vaginal swab tested positive for Callum's DNA, and her urine tested positive for Benzodiazepines and Alprazolam (DE209:137-38,156-57), although she still did not know whether she had had sex (DE209:100-01,133).

Later that day, Flanders left a voicemail, still pretending to be a scout, saying they would be picking the girls soon (DE209:93-94).

23

Ms.Caldwell testified that both Karen Watson and Flanders seemed legitimate (DE209:134-35). They never discussed nudity, sex, or pornography (DE209:62-63,71-72). She voluntarily drank alcohol, but did not knowingly ingest drugs (DE209:130,136).

A copy of Ms.Caldwell's Modelmayhem profile page was found in Callum's residence. It had been altered to add lewd statements that never appeared on Ms.Caldwell's real profile (DE209:46-51,143-47; DE213:145-50). No footage of Ms.Caldwell's sexual encounter with Callum was discovered.

## 6. **Lucrese Williams** (Counts14-15).

In May 2010, Ms.Williams, a 23-year-old aspiring model, was contacted via Modelmayhem email by "Errick Farmer," who represented that he was with Olympic Models and told Ms.Williams that he loved her "look." After checking out Olympicmodels.com as Farmer recommended, Ms.Williams provided her phone number (DE211:215-22;GX193H).

Ms.Williams received a phone call from "Eric Lawson," whom she later identified as Flanders, saying he was a modeling recruiter for Olympic Models and he liked her "look." Flanders explained that the audition was for a Bacardi commercial, was worth $100,000, and might involve acting out a pretend love scene.

Flanders sounded professional and never mentioned pornography (DE211:222-29,257-59;GX193G).

When Ms.Williams arrived in South Florida, Flanders met her in her hotel lobby. Flanders drove her to a liquor store and then to an area park, where he directed her to drink a shot, say certain lines, and walk away so that he could film footage for the casting call. Flanders poured the liquor into a cup as she walked away. After repeating the scene several times, Flanders said it was time to meet the casting director. They did not discuss taking nude photographs or filming real love scenes (DE211:230-41,247,294-96).

While in Flanders' car, Ms.Williams began to lose consciousness. They drove several places before arriving back at her hotel, although Ms.Williams did not remember doing so (DE211:242-44). She woke up in her hotel room to find Flanders and the "director," later identified as Callum coming into her room (DE211:244-45).

Flanders told Ms.Williams that she needed to reshoot the commercial, provided her another shot of alcohol, and filmed her as she repeated the scene. The next thing she remembered was Callum on top of her having sex while Flanders filmed it (DE211:244-47). Although depicted on the video (GX159A), she did not remember performing oral sex on Callum, answering questions, signing a Model Release Form (GX155), or taking photos (DE211:248-55, 261-66; GX125).

25

When Ms.Williams awoke the next morning, she left quickly to catch her flight. She noticed that the modeling photos and biography she had brought with her were missing (DE211:248,263,298-300; GX123-24); later these were discovered in Callum's home (DE213:151; GX169). When she arrived home, she went to sleep. She did not report the incident until several days after her meeting with Flanders (DE211:255-56). By that time, her urine tested negative for Benzodiazepines (below the laboratory's threshold), but her vaginal swab tested positive for Callum's DNA (DE211:241-42; DE212:6-7; GX1).

Ms.Williams sent an email to Farmer, but he never responded (DE211:259-60). Flanders, still using his alias, left Ms.Williams a voicemail telling her she did a great job and would hear from him soon (DE211:260).

Ms.Williams believed she was being offered a commercial and modeling contract and would not have agreed to engage in sexual acts if she were feeling like herself (DE211:247-48, 264). Ms.Williams did not know that the videotape had been distributed until law enforcement told her (DE211:264).

### 7.    __Laiken Harris__ (Counts16-18)

In February 2011, 23-year-old aspiring model Laiken Harris received an email through her Modelmayhem profile page from "Tina Clintmore," telling her she looked great and offering to refer her to a man who had gotten her a contract worth

26

over $200,000 (DE212:7-18).  Later investigation revealed that that name "Tina Clintmore" was used on a computer seized from Flanders' residence (GX191,193C).

Ms.Harris received a phone call from "Eric Lawson," whom she later identified as Flanders, telling her that he liked her "look," that he was a scout for Olympicmodels and Sony Productions, that she could research his name online, which she did, that he had helped Clintmore get into modeling, and that she could make six figures and be the face of a new alcoholic beverage campaign.  He offered an audition in South Florida that would involve photographs, acting, and a love scene, which Flanders described as staged and fake (DE212:18-30,72-74,101,111-12,144;GX193K).  Flanders called her from a blocked phone number, which Flanders explained was because he was doing a photo shoot on a yacht (DE212:24).

Upon arrival in South Florida, Ms.Harris met Flanders outside her hotel. Ms.Harris brought her pictures, a biography, and identification, items which later were found in Flanders' residence (DE212:30-35,75-76,170-72; GX169).  Flanders drove Ms.Harris to the parking lot of Greenwich Studios, ran inside purportedly to give Ms.Harris's documents and photos to his partners, and drove her to a different part of the parking lot to film the audition.[15]  Flanders retrieved liquor from his trunk

---

[15]    Greenwich Studios' building courtyard is accessible to the public (DE213:139-41).

and poured it into a cup.  As Flanders instructed, Ms.Harris said her lines, took a shot, and then walked away, repeating several times.  She observed that one bottle was only partially full, although the cap appeared to be secured (DE212:35-42,105-09).

As Flanders drove Ms.Harris back to her hotel, she began to fell very dizzy. Flanders said that his partner would be joining them at the hotel to film a "love scene," which Flanders previously had described as "staged and fake" (DE212:21,42-45,101).  Ms.Harris still believed that Flanders was a real modeling scout (DE212:145,149-51).

When they reached Ms.Harris's room, Flanders' partner, later identified as Callum, arrived with professional camera equipment (DE212:45,74-75).  Ms.Harris was feeling very disoriented, but remembered signing a Model Release Form and answering some questions on camera.  Flanders instructed her to say that she had not had any alcohol (DE212:45-57).  Ms.Harris did not remember getting undressed or taking nude photos.  She remembered having sex with Callum while Flanders filmed, although she did not remember most of it and was shocked when she saw the footage (DE212:49-54,115,125,139; GX128,157).  Ms.Harris also did not remember leaving the hotel with Flanders and Callum, although security footage from the hotel revealed that she did so (DE212:47-49).  Ms.Harris never agreed to engage in pornography (DE212:76).

Ms.Harris awoke alone the next morning. Her room was in disarray, and she was wearing different clothing. She was bleeding vaginally, her face was swollen, and there was vomit and a used condom in the trash can (DE212:57-63,141). When Ms.Harris contacted Flanders, he told her nothing happened, that she was hallucinating, that she bruised her lip eating a burger, and that they could finish the audition later (DE212:57,63-79,116-18,146). Of 18 calls and texts that Ms.Harris made from her phone that morning, Ms.Harris only remembered two (DE212:119). Ms.Harris reported her sexual assault to the police, and, unbeknownst to Flanders, they were present when Flanders texted Ms.Harris that he was returning to the hotel (DE212:59,63-69). A police officer observed a man believed to have been Flanders when he arrived at the hotel, but he saw the officer and hurriedly left (DE212:152-55,163).

Ms.Harris's vaginal swab tested positive for Callum's DNA, and her urine tested positive for Alprozolam, although she had never ingested that drug (DE212:42-43,71-72; GX1).

Two weeks later, the police received a package from "Farmer" reporting Ms.Harris missing and containing copies of her identification, Model Release Form, photographs, and video-interview. Flanders' fingerprints were on these items (DE212:164-66).

29

3.    **Standards of Review**

Challenges to an indictment's validity are considered *de novo*, but certain challenges not timely-raised are waived. *United States v. Ramirez*, 324 F.3d 1225, 1226-28 (11th Cir. 2003).

Preserved arguments are reviewed for harmless error, whereas arguments raised for the first time on appeal are reviewed for plain error.  The defendant must show error, that is plain, and that affects substantial rights. The Court may exercise its discretion to notice a forfeited error only if the error seriously affects the fairness, integrity, or public reputation of the  proceedings. *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005).

The Court reviews for abuse of discretion evidentiary rulings, *United States v. Baker,* 432 F.3d 1189, 1202 (11th Cir. 2005), and orders denying a new trial motion, *United States v. Hernandez,* 433 F.3d 1328, 1332 (11th Cir. 2005), and grand jury disclosure, *United States v. Aisenberg*, 358 F.3d 1327, 1338 (11th Cir. 2004).

The Court reviews prosecutorial misconduct arguments *de novo*. *United States v. Merrill,* 513 F.3d 1293, 1306-07 (11th Cir. 2008).

Sufficiency is reviewed *de novo,* viewing evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in

its favor. *United States v. Calderon,* 127 F.3d 1314, 1324 (11th Cir. 1997), *modified on other grounds*, *United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998).

The Court reviews application of the Sentencing Guidelines *de novo* and findings of fact for clear error. *United States v. Ellisor,* 522 F.3d 1255, 1273 n.25 (11th Cir. 2008). Unpreserved claims are reviewed for plain error. *United States v. Castro,* 455 F.3d 1249, 1251 (11th Cir. 2006). The reasonableness of a sentence is reviewed for abuse of discretion. *United States v. Register,* 678 F.3d 1262, 1266 (11th Cir. 2012).

The Court considers *de novo* whether ineffectiveness arguments should be considered on direct appeal and whether an appeal should be dismissed as untimely. *United States v. Glover,* 686 F.3d 1203, 1205 (11th Cir. 2012).

## Summary of the Argument

The evidence sufficiently supported Flanders' 18 convictions. He and Callum conspired to enrich themselves by selling video-recordings they created by defrauding and drugging women so Callum could have sexual intercourse with them while Flanders filmed. Callum then distributed the videos over the internet and in stores. The drugs facilitated and concealed the fraud by impairing the victims' judgment, making them more compliant and suggestible to instruction, wiping their memories clean, and making them look like willing participants in low budget pornography they

31

would not remember.  Seven victims testified to remarkably consistent, equally harrowing, stories.  Additional evidence, such as pornographic videos, results of DNA and drug testing, expert testimony, evidence seized pursuant to search warrants, and phone records and computer analysis, corroborated the victims' testimony.

Flanders waived his attacks on the indictment's validity by not raising them before trial as required by the Rules of Criminal Procedure.

Flanders has not demonstrated that the government committed prosecutorial misconduct.  Most of his arguments are unpreserved, but under any standard of review, he has failed to show either *Brady* violations or improper closing argument.

The court did not abuse its discretion in admitting evidence that Flanders conducted internet searches for images of sex with unconscious women and that Benzodiazepines were discovered in a shared bathroom in his residence during the conspiracy.  The evidence was relevant, and arguments that others had access to the computers and drugs went only to its weight, not its admissibility.  The evidence of the online searches was not unduly prejudicial in light of the gravity and severity of the other evidence.  The court did not violate the best evidence rule by permitting the government to read into the record a transcript of Flanders' post-*Miranda* statements where the digital recording was unintentionally destroyed and the transcript was

32

accurate. The court also did not err in admitting evidence seized pursuant to a search warrant which Flanders never moved to suppress pretrial.

Appellants were not denied their rights to a public trial by the court's decision to lock the courtroom doors during closing arguments. The public, including many of appellants' friends/family were present.

The Court should not rule on Flanders' ineffective assistance of counsel arguments on direct appeal, as the record is insufficiently developed.

Flanders was not entitled to grand jury transcripts. The documents he relies on do not demonstrate that the grand jury was presented with false evidence that his crimes involved minors. Moreover, given that the indictment nowhere mentioned minors, and that the trial evidence only concerned adults, the jury verdict rendered harmless any possible error in the grand jury.

Appellants' sentences were proper. They have not demonstrated any error in the calculation of their advisory guideline range, or in the court's decision to upwardly depart based on their extreme conduct. Likewise, they have failed to demonstrate that the court abused its discretion in imposing life sentences to reflect the seriousness of the crimes, provide just punishment, and protect the public. The sentences did not violate the Eighth Amendment or Double Jeopardy.

Flanders' *pro se* criminal forfeiture appeal should be dismissed because it is

untimely, and the arguments are not related to the forfeiture.

## Argument

To avoid repetition, we have consolidated and reordered issues. We identify

each appellant's arguments by brief and page. Despite lengthy briefs and numerous

issues, this is a straightforward case, cleanly tried, with overwhelming evidence.

## I.    The Evidence Was Sufficient to Support Flanders' Convictions.

Inexplicably ignoring the government's case, Flanders launches a wholesale

attack on the sufficiency of the evidence, excising and isolating bits of evidence from

the whole in an attempt to cast doubt on the jury verdict (FlandersBr:34-56). He does

not discuss the evidence arrayed against him, relegates what he attempts to pass for

a statement of facts to a single paragraph (FlandersBr:4), and improperly summarizes

the testimony in his Appendix:Tabs16-17 in contravention of the briefing rules. This

improper Appendix should be stricken.

Regardless of Flanders' strategy of focusing only on fragments of evidence that

he views as favorable, the evidence overwhelmingly demonstrated that he and Callum

conspired to drug unsuspecting women into submitting to sex acts they later would

not, or barely, remember. His arguments demonstrate a fundamental disregard for the

standard of review and an unwarranted rejection of the jury's credibility findings. We

34

have summarized and detailed the evidence in the Statement of Facts, and given space restrictions, we do not repeat the evidence here, but rather respond to Flanders' specific sufficiency challenges.  We discuss only the statutory elements that he challenges.

### A.    Conspiracy (Counts 1, 13)

#### 1.    Agreement to Defraud

Both the §371 and §1594(c) conspiracy offenses required proof that appellants agreed to violate §1591(a)(1) (sex trafficking by force, fraud, or coercion) and that they knew the unlawful purpose of the plan and willfully joined in it. The sex trafficking conspiracy here was carried out by fraud: Flanders lured women, under false pretenses, to audition for what they believed were legitimate modeling opportunities, and he tricked them into consuming alcohol laced with Benzodiazepines in order to videotape them engaging in sexual acts with Callum. Flanders' argument that there was no evidence linking Callum to the drugs, and therefore, no evidence linking him to the agreement to defraud (FlandersBr:39-40), ignores substantial circumstantial evidence of their agreement.[16]

---

[16]    *United States v. White,* 663 F.3d 1207, 1214 (11th Cir. 2011) (conspiracies are "secretive by nature" and "may be proven entirely from circumstantial evidence").

35

The government did not have to prove that Callum agreed to commit fraud by drugging alone. The government proved that the scheme involved fraud from the moment that Flanders made online contact using aliases, to Flanders' impersonating a legitimate modeling scout, to his drugging the victims, to Callum's telling victims that he was a subcontractor/agent for Bacardi, to the sales of pornographic videos without the victims' knowledge.

Callum's own words corroborated his detailed knowledge of the fraud. For example, the evidence showed that Flanders, using an alias, lured Ms.Tyler to South Florida under the pretense of an audition for a Bacardi commercial. Upon meeting her, Callum told her that he was the Bacardi agent who would be filming the commercial (DE210:108-09,173). Callum could only have known to misrepresent himself as a Bacardi agent if he were in on the fraud. Similarly, Callum told Ms.Smith that he worked for "Karen Watson" and laughingly told her to say hi to Karen during the sexual assault. Callum could only have known that Flanders used the alias Karen Watson if he were in on the fraud (DE211:60-61; DE213:177-79). So too did Callum's mocking use of the phrase "love your look" during Ms.Tyler's sexual assault, the exact phrase Flanders invariably used with the victims (DE211:58-60; GX193P), demonstrate that he was a party to the fraud. Callum's intricate

36

knowledge of Flanders' ruses established their agreement even without proof that Callum knew the women were drugged.

Nevertheless, the circumstantial evidence overwhelmingly showed that Callum knew the victims were drugged and directly benefitted from it. Callum starred in the videos and had an unparalleled opportunity to closely observe the women, who suffered bouts of unconsciousness and unusual weakness during the sexual acts captured on videotape: Ms.Heron, a 24-year-old Army soldier could not muster the strength to lift herself off the sofa (GX190B); Ms.Smith, a fitness instructor, did not have the strength to stay awake (GX50C); Ms.Tyler was visibly unconscious as Callum ejaculated on her (GX50A).

Moreover, the jury was entitled to infer that Flanders would not have allowed these women to have intimate sex with someone who was unaware that they were drugged, thereby risking exposure of his scheme. It defies commonsense to suppose that Callum was unaware that Ms.Caldwell, who remembered absolutely nothing and presumably was unconscious during the entire sexual assault, had been drugged. Callum's DNA was found on Ms.Caldwell's vaginal swabs even though she did not even remember meeting him. The jury properly inferred that Callum knew the women were being drugged into submitting to his sexual acts.

37

## 2.    Overt Acts

Equally frivolous is Flanders' argument that there was no evidence of an overt act underlying his §371 conviction (FlandersBr:40-41).  As support, he makes the rather startling assertion that the victims' signatures on Model Release Forms giving Miami Vibes the right to publish their images shows their voluntary participation. Of course, the government proved that the victims signed these forms *after* Flanders drugged them, rendering their consent a nullity (DE211:152).  Moreover, although they may have agreed to distribution of images from their auditions, which they believed were for legitimate modeling contracts, they did not agree, by signing the forms, to be filmed while being sexually assaulted or for those pornographic images to be distributed for appellants' benefit.  Nothing in the generic forms constituted an agreement to engage in pornography, while drugged or otherwise.

In any event, the evidence that Flanders committed at least one overt act was overwhelming.  For example, the government proved, through Ms.Smith's testimony, that "Flanders falsely and fraudulently representing himself to be 'Karen Watson,' sent an email to [Ms.Smith], in which he falsely and fraudulently pretended to be a female employee of a modeling agency whose website was www.olympicmodels.com, and offered to put [Ms.Smith] in touch with a modeling

38

scout" (DE71:7 (overt act 18); DE210:184-89).  No further proof of overt acts was needed–one was sufficient,[17] although the government proved all 26.

### B.    Sex Trafficking

Without citation, Flanders argues that §1591 was drafted as a means of federally prosecuting "pimps" for acts of prostitution (FlandersBr:38,44), and therefore, he cannot be guilty.  Even if the statute is used most often to reign in pimps who prostitute women, he cites no support for the proposition that Congress limited the statute to that scenario. Flanders' actions are equally heinous and abhorrent and no less a form of sex trafficking, however novel.  As discussed below, Flanders' attempts to evade prosecution for his sex trafficking crimes  are meritless.[18]

---

[17]     *United States v. Fontenot*, 483 F.2d 315, 322 (5th Cir. 1973) (proof of single overt act sufficient).

[18]     Flanders notes that the jury instructions defining the §1591(a) elements (DE214:91) omitted reference to Count 2 as an enticement count (FlandersBr:44n.6). He did not object to this omission below, he does not develop an argument in his brief, and it should not be considered.  In any event, he has not demonstrated prejudice. *Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 1837 (1999). The jury had the indictment, which plainly charged a §1591(a) offense in Count 2, the jury instructions fully defined the elements of §1591(a) offenses, and the evidence supporting the Count 2 conviction was overwhelming.  Moreover, the properly-instructed jury convicted Flanders of Count 3, which charged the same conduct as Count 2, save for the addition of the benefitting element.

39

### 1.     Recruitment/Enticement and Fraud

All sex trafficking counts required the government to prove that appellants recruited/enticed the victims knowing[19] that fraud would be used to cause them to engage in a commercial sex act.  Contrary to Flanders' arguments (FlandersBr:44-49,51), the evidence overwhelmingly established that he recruited/enticed women using a fraudulent business model so convincing, that he knew they would fall prey to his "audition" ruse.  He tricked them into tasting alcohol that he secretly had laced with Benzodiazepines so that they became disinhibited and compliant, with little to no memory of him filming as Callum sexually assaulted them and later commercially distributed the films.

In the face of this evidence, Flanders argues that the women did everything of their own volition: they paid for their own travel, they signed Model Release Forms, they voluntarily met with an unknown man and drank alcohol, and Ms.Williams and Ms.Harris agreed to do "love scenes" (FlandersBr:42).  Of course, the evidence showed that the victims did all this as a direct result of Flanders' fraud.  They came for what they believed was a lucrative modeling opportunity, and they drank alcohol as a result of Flanders' convincing explanations, but they all testified that they did not knowingly ingest date-rape drugs.  And while it is true that they signed Model

---

[19]     A reckless disregard standard applied to the post-2008 offenses.

Release Forms, they had little or no memory of doing so because they already were drugged. Ms.Williams' and Ms.Harris's agreements to act out a "love scene," which they understood from Flanders to be like acting in a movie, hardly constituted an agreement to film pornography (DE211:224-26,274,295-96; DE212:21-22,36, 44,101,111-12). The victims testified that they never agreed to pornography, did not know their videos were being sold on the internet, and in Caldwell's case, she still did not know that she had had sex with Callum despite testing positive for his DNA (DE209:100-01,133).

The wisdom of the women's decisions was not relevant or exonerative. That they were aspiring models who were duped by Flanders' emails, phone calls, and ingenious explanations instead proves his criminal prowess. Victims testified that they trusted Flanders because they believed a woman had referred him, they researched his representations online, he appeared professional, and they believed his seemingly credible explanations. That victims were filmed answering questions stating that they were acting voluntarily and had not ingested alcohol, was part of the fraud and certainly does not detract from the fraud committed upon them. They were already drugged, their responses were tainted, and their consent was invalid. Evidence showed that appellants induced them to lie in answering the questions. For example, Ms.Heron's video reveals that, when she fell onto Callum's couch, he

exclaimed that she looked "tipsy," but Flanders then instructed her to say on camera that she had not had alcohol (GX56).

### 2.    Credibility

Flanders' claim that the victims' testimony was conflicting (FlandersBr:42-47) likewise does nothing to detract from the sufficiency of the evidence.  The jury observed the victims' demeanor, their truthfulness was thoroughly explored during cross-examination, and the judge instructed the jury regarding witness credibility (DE214:84-85).  "By their verdict, the jury determined, albeit implicitly, that the testimony those witnesses gave was credible," and any minor inconsistencies in their testimony did not render it "incredible as a matter of law." *United States v. Calderon,* 127 F.3d 1314, 1325 (11th Cir. 1997), *modified on other grounds*, *United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998).  This is especially true since the victims were attempting to remember events after consuming drugs that affected their memories (DE213:181-82).  Flanders has provided nothing that would justify usurping the jury's credibility determination.

Flanders claims that Ms. Tyler's testimony was incredible because she saw pornographic photos on the wall of the studio where she met Callum, but she did not leave, and she signed a Model Release Form stating that she agreed to perform "any acts discussed" (FlandersBr:42-44,46).  By this time Flanders already had secretly

42

given her a drug that impaired her memory, made her more suggestible and sexually compliant, and rendered her consent invalid (DE211:111-13,151-53). In fact, Ms.Tyler's testimony was quite chilling. After unknowingly ingesting Alprazolam, Flanders took her to meet Callum, who introduced himself as a Bacardi agent. She saw pornographic photos on the wall and wanted to run, but her body was "frozen," and she passed out, momentarily regaining consciousness only to find Callum naked on top of her and having her perform oral sex (DE210:108-11,120-24,173). Consistent with the effects of Alprazolam, Ms.Tyler did not remember either her own actions or what was done to her as revealed in the videotape sold on the internet (DE210:124-32,172-77). That she regained enough presence of mind to later write down Flanders' license plate number does nothing to detract from her credibility, but merely shows that she managed to gather her thoughts momentarily as the drug wore off. Indeed, she also managed to secretly dial 911 to report her rape despite her fear that Flanders would kill her (DE210:111-18). Likewise, that Ms.Tyler testified that she felt the effects of the drug almost immediately does not impugn her credibility. Dr.Greenblatt explained that many factors affect how someone reacts to the drug, not the least of which is ingesting it in liquid form, dissolved in alcohol (DE211:103-04,110-11,122,137).

Flanders' argument (FlandersBr:40,44,46-47) that Ms.Heron told police that she consented to sex misreads the record. Ms.Heron's testimony, under oath at trial, was that, after ingesting the Alprazolam-laced alcohol (DE210:175-76) and meeting Callum, whom she believed was a "subcontractor" auditioning her for a Bacardi commercial, the next thing she remembered was Callum putting his penis into her mouth, and then ejaculating on her forehead while Flanders filmed (DE209:196-97). She did not remember having sexual intercourse and did not know that the video was being sold until the prosecutors told her (DE209:196-97; DE210:25-28). Ms.Heron testified that she did not agree to have sex or participate in pornography (DE210:68-69), and the jury believed her. On cross-examination, defense counsel questioned her about a police report that represented her as saying the sex was "consensual." Ms.Heron testified that when she used the word consensual, she meant that she did not object–that she "couldn't" object because she "didn't know what was going on" (DE210:68-69). This report was *not* adopted by Ms.Heron, was *not* a sworn statement, was *not* admitted into evidence (DE210:50-51), and should not be considered even though Flanders includes it in his Appendix:Tab9.

Flanders' attack on Ms.Smith's testimony is equally unavailing. He claims that her testimony was unbelievable because, even after the sexual assault, she still believed Flanders (using the alias "Darius") was a modeling scout and she feared that

44

he would "blackball" her    (FlandersBr:47). Rather than rendering Ms.Smith's testimony incredible, this dramatically demonstrates how convincing Flanders was in his modeling-scout persona.  Ms.Smith was an aspiring model when she responded to "Karen Watson's" email, which she received via Modelmayhem.com, a website for models looking for work (DE209:142,155).   Using the "Karen Watson" alias, Flanders suggested that Ms.Smith "visit us" at www.olympicmodels.com, which she did, learning that it was a legitimate and impressive modeling site.  This reassurance prompted Ms.Smith to email "Karen Watson" her phone number.  Flanders, using the alias "Darius," then contacted her and offered her an audition for Bacardi worth over $50,000.  Flanders seemed professional, and Ms.Smith believed he was a modeling scout, believed his explanation that she had to taste the alcohol to ensure she did not grimace on camera, and even after the assault, still trusted Flanders and thought Callum was to blame.  Ms.Smith called Flanders to express her anger that Callum had assaulted her and Flanders had filmed it rather than helping her.  Still pretending to be "Darius" the modeling scout, Flanders responded that she had broken under pressure and would not be chosen as a model for the commercials.  Flanders also told her that the tape erased itself.  Ms.Smith then received an email from "Karen Watson" telling her she had spoken to "Darius" and that although she had told the contractor to shoot a love scene, she did not mean a real one and was removing him from the list

45

of subcontractors, and she would deal with Darius as well.  At the time, Ms.Smith still believed that a modeling opportunity existed and that Darius and Karen Watson were genuinely connected to the modeling industry (DE210:184-92,200-03,210,214,227-41).  Smith also described herself as not in her "right mind" when she sent the post-attack emails (DE210:239-41,246).

Given the intricacy of Flanders' fraud, Ms.Smith's continued belief that a lucrative modeling job existed and her fear that what transpired would blackball her does not undermine her credibility, but only proves how thoroughly Flanders had deceived her.  It was a part of Flanders' modus operandi to continue the ruse after the assaults in an attempt to deflect blame and avoid police involvement by still pretending to be a modeling scout.  That Ms.Smith and others still sought the job after their drugged encounters with Callum does not exonerate him or render the victims' testimony incredible.  Rather, it is a sad testament to Flanders' deceptive artistry.

Ms.Bray's testimony was neither inconsistent nor coerced (FlandersBr:37,47-48).  It was tragic.  Ms.Bray was a 19-year-old virgin who was so traumatized upon finding herself raped and bleeding from her vagina that she lied to police and did not want to testify because she could not face the situation.  Nonetheless, she denied being coerced to testify (DE211:206).  Flanders' argument that her admission to

underage drinking undermines her credibility–that 19-year-old who drinks alcohol is necessarily a liar–is so outrageous as to warrant no response.

Contrary to Flanders' argument (FlandersBr:40,44,45), that Ms.Harris and Ms.Williams agreed to perform a "love scene" does not impugn their testimony; both women testified that Flanders described the love scene as mere acting, and not real or pornographic (DE211:224-26, 274,295-96; DE212:21-22,36, 44,101,111-12), and both women testified that they never discussed pornography, much less agreed to be filmed having sex (DE211:224-27,241,247-48,264,294-96; DE212:76).

Flanders also misconstrues the testimony of the photographer who was supposed to take photographs of Ms.Caldwell after her "audition" with Flanders (FlandersBr:48). He testified that it was not unheard-of to have photo shoots at night, and that using Modelmayhem to find modeling jobs was its very purpose (DE209:142-43,155). This testimony was not exonerating, but rather helped explain why the women believed Flanders' ruse.

**C.    Benefitting** (Counts3,6,9,11,15,18)

Flanders' argument that there was no evidence that he benefitted (§1591(a)(2)), or attempted to benefit (§1594(a)), "financially or by receiving something of value" from participating in the sex trafficking venture (FlandersBr:35-36,49-51), ignores the evidence.

47

The purpose of appellants' "venture" was to produce and sell pornographic footage of Callum having sex with drugged women. Searches of Callum's business and home uncovered thousands of commercial copies of the victims' DVDs, which were being sold in pornography stores and on the internet, as well as receipts showing payment from the sales (DE212:180-83; DE213:8-19,25). Flanders recruited/enticed the women who appeared in the videos Callum sold, and his name appeared on a release that Callum signed in 2010, a copy of which was found in Flanders' bedroom (DE212:185; GX158). Videos of victims Heron, Tyler, Bray, and Smith are still available for purchase (DE210:127-29,245-47;DE213:123-39). Because Flanders aided and abetted Callum in creating the videos Callum sold for financial remuneration, he is equally guilty of benefitting from this fraud as Callum (DE214:102(jury instruction)).

Flanders also benefitted personally. He directly received payment from Ms.Williams and Ms.Harris in the form of phony auditioning fees which both women paid, believing that it was required for the audition (DE211:242; DE212:33-34). However small, this financial benefit was sufficient to satisfy the "benefitting" element. *E.g., United States v. Jennings*, 280 Fed.Appx. 836, 844 (11th Cir. 2008) ($250 and gas money). Moreover, during both the 2007 and 2011 searches of his residence, officers seized copies of victims' videos, a thing of value to Flanders, who

48

spent considerable time online looking at pornography as evidenced by his searches for sex with unconscious women (DE213:71-74,82-87,96-99,110-18).

Regarding the attempt counts, although appellants never managed to sell the footage of Ms.Williams' and Ms.Harris' fraud-induced sexual encounters with Callum, edited videos of both women's footage was copied onto DVDs and thumb drives and found in Flanders' home, along with a package in which Flanders himself stated that he was "trying to sell everything," including Ms.Williams' DVD, to HomeGrownVideo (DE212:183-88).[20]

**D.    Drugs** (Counts5,8,12,17)

Flanders fruitlessly attempts to cast doubt (FlandersBr:37-38,51-56) on the overwhelming circumstantial evidence demonstrating that he drugged victims Tyler, Bray, Caldwell and Harris with Alprazolam.  Flanders claims that he was not properly charged with a §841(a) offense, arguing that the jury convicted him of drugging the victims through mere sympathy and improper assumptions.  As discussed *infra* 54, the indictment was sufficient, and the jury was properly charged with the statutory elements.  Substantial evidence, not sympathy or assumptions, supports the verdicts.

Lured by Flanders' fraudulent promises of a lucrative commercial audition, each woman specified in the drug counts testified to remarkably similar "auditions,"

---

[20]    Ms.Caldwell's video was never found.

49

in which Flanders instructed them to walk away from him, return to say a few lines, and taste some alcohol, which he provided, purportedly because the commercial involved a well-known beverage company such as Bacardi.  The women likewise described remarkably similar reactions after ingesting the alcohol, including bouts of unconsciousness, weakness, and memory loss.  They did not remember the majority of the sexual acts, waking from unconsciousness to find Callum naked on top of them, having oral sex, or ejaculating on their faces.  Although they voluntarily drank Flanders' alcohol, they did not knowingly ingest drugs, yet their urine tested positive for Alprazolam shortly after the auditions.  All except for Ms.Caldwell testified that the amount of alcohol they consumed was not a significant amount for them (DE210:103-05; DE211:166; DE212:139-41), lending credence to the conclusion that they were not simply "drunk" as Flanders claims.

Specifically, after her "audition" with Flanders and sexual assault by Callum, Ms.Tyler's urine tested positive for Alprazolam (DE210:176-77), although she had never knowingly ingested that drug (DE210:104-05).  Ms.Tyler thought the alcohol was for a Bacardi commercial, and she drank it voluntarily, but she did not agree to ingest drugs in that alcohol (DE210:171-72).

50

Likewise, Ms.Bray had never taken Alprazolam (DE 211:166). Nevertheless, her urine tested positive for the presence of Benzodiazepines after her "audition" with Flanders and sexual assault by Callum (DE 211:213).

Ms.Harris too had never taken Alprazolam and had not had any alcohol or narcotics before the audition (DE212:42-43). Nevertheless, the morning after her "audition" and sexual assault by Callum, her urine tested positive for Alprazolam (DE212:71-72). That she also tested positive for marijuana does not alter the significance of this evidence. Ms.Harris admitted that she had smoked marijuana approximately one week before her audition, and Dr.Greenblatt confirmed that a positive marijuana test can result a week later, while Alprazolam clears the body in less than 72 hours (DE211:107-08,131-32).

Ms.Caldwell, who was "not a drinker" (DE209:61), had the most severe reaction after her audition. She drank only half a Bacardi wine cooler and a full airplane-sized bottle of alcohol, yet she remembered absolutely nothing until she awoke the following day. Sadly, she still did not know if she had had sex that night, although her vaginal swab tested positive for Callum's DNA as well as Benzodiazepines generally and Alprazolam. Caldwell agreed to drink the alcohol, which she believed was required for the audition, but she did not agree to ingest a drug (DE209:130-36).

51

Dr.Greenblatt explained that Benzodiazepines are stable and soluble in liquid, they are stronger if ingested in liquid form, and alcohol intensifies the reaction (DE211:110,117,122,137).    He explained that a positive urine test for Benzodiazepines means that the individual had ingested it recently, within 24-72 hours (DE211:101,131-32).  And although he could not determine conclusively from the videos *alone* whether the victims' behavior was due to Benzodiazepines (DE211:146-49), the fact that they tested positive shortly after the sexual assault, made this conclusion self-evident for the jury.  Dr.Greenblatt explained that after an individual ingested Benzodiazepines, their behavior likely was a result of the drug (DE211:139-43,153).

In light of this evidence, the jury appropriately rejected Flanders' argument, which he revives on appeal, that alcohol alone caused the women to black out.  That argument was especially specious given that they all tested positive for both Benzodiazepines and Callum's DNA.  It matters not that alcohol can produce similar effects.  The women admitted drinking the alcohol Flanders provided, but they denied knowingly ingesting drugs, and the jury was entitled to credit their testimony. The jury rejected Flanders' attempt to foist blame on the women, and its credibility decisions cannot be usurped merely because Flanders wishes the conclusion were different.

52

Additionally, although the women did not see Flanders spike the alcohol, the evidence established that he had the opportunity–either by putting it into the alcohol before the audition, having it already in the cups he used during the audition, or putting it into the alcohol while the women walked away with their backs turned.

Equally irrelevant is Flanders' argument that not all of the women tested positive for drugs. All of the women specified in the drug counts did. That is all that was necessary for conviction on those counts. Moreover, his recitation of the evidence is incorrect. Ms.Heron's urine tested positive for Alprazolam (DE210:175-76), but her conduct fell outside the statute of limitations for drug offenses (*see* DE214:18). Ms.Smith's urine was not tested because she did not timely report the incident to police, and the single shard of glass from the bottle Flanders destroyed was not tested until a week after the audition, making it unlikely that any trace of drugs remained. Ms.Williams tested negative more than 48 hours after her attack, and Dr.Greenblatt testified that a positive test would depend on the testing threshold and how long the drug had been in the body (DE211:99-110).

That some of the victims may have stated on videotape that they were not under the influence of alcohol or drugs was irrelevant. The videotapes were made after the women were drugged, decimating the reliability of their answers. Indeed, Ms.Harris

53

recalled Flanders instructing her to say that she had not had any alcohol, even though he had given it to her himself (DE212:46).

## II.  Flanders Waived His Attacks on the Indictment.

Flanders argues, for the first time, that the indictment[21] was defective because: (1) the government fraudulently told the grand jury that the crimes involved minors; and (2) the drug counts omitted a citation to the statute (FlandersBr:19-22).  Because Flanders did not timely raise either ground, he has waived his arguments.

Federal Rule of Criminal Procedure 12(b)(3)(B) requires that a defendant raise, before trial, challenges to an indictment's validity, other than an objection that the indictment fails to show jurisdiction or state an offense (which may be raised any time).  To give effect to this timely-filing requirement, Fed.R.Crim.P. 12(e) provides that the failure to timely raise such arguments constitutes a waiver unless defendant shows good cause. *United States v. Ramirez*, 324 F.3d 1225, 1227-28,n.8 (11th Cir. 2003); *United States v. Dulcio*, 441 F.3d 1269, 1275 (11th Cir. 2006).  Where a defendant fails to file a pretrial motion and does not demonstrate good cause,[22] review even for plain error is excluded because the specific waiver provision in Rule 12(e)

---

[21]     To the extent that Flanders' attack on the original indictment survives the superseding indictment's return, our response is the same.

[22]     Flanders does not assert good cause for his untimely motion.

54

trumps Fed.R.Crim.P. 52(b)'s plain error standard. *United States v. Suescun,* 237 F.3d 1284, 1288,n.13 (11th Cir. 2001).

###    A.    Grand Jury

Flanders argues that the indictment was defective because the government presented false evidence that his offenses involved minors. As support, Flanders relies primarily on documents that were provided during pretrial discovery (FlandersAppendix:1,2,4,7). If, as Flanders claims, these documents show that the government presented false evidence that his crimes involved minors, he should have raised that argument pretrial. *Ramirez*, 324 F.3d at 1228 n.8. To the extent that Flanders also relies on extra-record documents, not presented to the district court that he apparently retrieved from online sources (FlandersAppendix:Tabs3,5,6), these documents should not be considered. *Chavez v. Secretary*, 647 F.3d 1057, 1062 n.2 (11th Cir. 2011) (appellate court generally will not review documents not presented to district court). Because Flanders did not timely argue that the indictment was defective, he has waived the argument on appeal.

In any event, he has shown no error. As discussed more fully *infra* 71, the allegations in the indictment belie any suggestion that the grand jury was duped into believing that appellants' victims were minors. The indictment explicitly refers to "adult" pornography: "Miami Vibes produced adult pornography in South Florida and

55

distributed it over the Internet and to local businesses" (DE71:2).  The indictment then mentions "women" or "woman" 19 times, while never once mentioning minors or girls (DE71:3-5). A "woman" is "an adult female person." http://www.merriam-webster.com (retrieved June 2013).  Given this, whatever pre-indictment documents may have used a short-hand reference to the statutory title that included the term "children"[23] had no bearing on the indictment the grand jury returned.[24]

## B.    Drug Counts

Flanders likewise waived his argument that the drug counts are defective for omitting citation to §841(a).  Flanders failed to raise it pre-trial, and it is not a claim that the court lacked jurisdiction or the indictment failed to state an offense. *Compare United States v. Izurieta*, 710 F.3d 1176, 1185 (11th Cir. 2013) (no subject matter jurisdiction where indictment charged non-criminal acts), with *United States v. Cotton*, 535 U.S. 625, 630-31, 122 S. Ct. 1781, 1785 (2002) (failure to allege element not jurisdictional).  He merely complains that the indictment omitted the statute number, which is not a jurisdictional defect. *United States v. Kumar*, 617 F.3d 612,

---

[23]    §1591 is entitled "Sex trafficking of children or by force, fraud, or coercion."

[24]    For the same reason, this Court should reject Flanders' argument (FlandersBr:23-24), raised for the first time, that his conviction should be reversed because the government committed misconduct in misrepresenting to the grand jury that the case involved minors.

622-23 (2d Cir. 2010) (charging wrong offense in indictment not a jurisdictional defect). Therefore, his claim is subject to Rule 12(e) waiver.

In any event, Fed.R.Crim.P. 7(c)(3) dooms his claim: "Unless the defendant is misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment...or reverse a conviction." Although the indictment cited only the penalty provision (§841(b)), it tracked the language for the offense (DE71), and Flanders does not identify any prejudice from the citation to §841(b) as opposed to §841(a). There could be none, as he was on notice of the offense charged via the statutory language, and the jury was properly instructed, without objection, on the statutory elements (DE214:87,101). *United States v. Bennett*, 368 F.3d 1343, 1354 (11th Cir. 2004), *vacated on other grounds* (sentencing/*Booker* issues), 543 U.S. 1110, 125 S.Ct. 1044 (2005).

## III.    The Government Did Not Commit Prosecutorial Misconduct.

### 1.    *Brady* Violations

For the first time, Flanders argues that the government withheld evidence, violating *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963) (FlandersBr:24-25). A *Brady* claim is available when the government suppresses exculpatory or impeachment evidence that the defendant either did not possess or could not have obtained with reasonable diligence. To win reversal, the defendant must demonstrate

that, had the evidence been disclosed, there is a reasonable probability that the outcome of the proceeding would have been different. *United States v. Fernandez*, 136 F.3d 1434, 1438 (11th Cir. 1999).

Flanders has utterly failed to satisfy *Brady* much less show plain error. *United States v. Kersey*, 130 F.3d 1463, 1465 (11th Cir. 1997) (reviewing *Brady* claim for plain error where not articulated in motion for new trial). First, all documents in the government's possession were provided in the government's discovery responses (DE36,42,57,58,62,87,94,100,104,114,117), which were equally available to, and reviewed by, both trial and appellate counsel. The so-called "missing" FBI302s do not exist, so there was nothing to turn over, a fact which could have been brought to light in the district court had Flanders timely raised his *Brady* claim.

Moreover, even if the documents he cites were not provided during discovery, Flanders has not even attempted to establish the impeaching or exculpatory value of the cited documents, nor has he argued prejudice, relying instead on bare assertions that documents were not produced. Absent a showing that there was a reasonable probability the outcome of trial would have been different, his argument fails.

### 2.    Closing Argument

None of the prosecutor's statements in closing, whether reviewed for plain or harmless error, require reversal as Flanders argues (FlandersBr:25-26,32).

58

In evaluating prosecutorial misconduct claims, the Court examines the context of the entire trial in light of any curative instructions to determine whether the prosecutor's statements were improper and prejudicially affected the defendant's substantial rights, meaning that there is a reasonable probability that, but for the remarks, the outcome of trial would have been different. *United States v. House,* 684 F.3d 1173, 1197 (11th Cir. 2012).

Flanders' argument that the prosecutor, over objection, improperly argued that he committed rape ignores the statement's context. The prosecutor was explaining that federal law requires an interstate commerce connection and does not criminalize rape (DE214:7-8). In any event, the jury already had heard from seven victims that Flanders had lured them to South Florida, laced their drinks with date-rape drugs, and filmed them having sex with Callum, after which they reported to rape treatment centers. The word rape was used throughout trial, without objection. If the jury believed that Flanders aided Callum's sexual assaults, it was because of his own actions, not the prosecutor's comments. If anything the comment confirmed that Flanders was *not* charged with ordinary rape but was charged with a federal crime requiring an interstate nexus. Moreover, the instruction that what lawyers say is not evidence, alleviated any possible prejudice (DE214:83).

Flanders also incorrectly argues that the prosecutor improperly commented on his silence over his objection (DE214:24-25). A comment is not an impermissible reference to a defendant's silence unless it was the prosecutor's manifest intention to urge the jury to draw an inference of guilt from silence, or the jury would "naturally and necessarily" construe the remark as such. *United States v. Thompson*, 422 F.3d 1285, 1299 (11th Cir. 2005). The prosecutor properly argued that the jury could consider as evidence of guilt that Flanders repeatedly lied to victims as part of his scheme and lied to police after waiving his *Miranda* rights in 2007. As Flanders did *not* remain silent following *Miranda* warnings, the prosecutor was entitled to comment on his lies and omissions. *United States v. Woodard*, 531 F.3d 1352, 1363 (11th Cir. 2008).

Flanders also complains, for the first time, that the prosecutor committed misconduct while refuting *Callum's* argument that he did not know the women were drugged. The prosecutor argued that the jury could infer Callum's knowledge from the fact that Flanders would not have allowed an innocent bystander to participate:

> [U]se your common sense, this whole scam, this whole fraud, depended on Mr. Flanders being able to trust that he can leave these women with Mr. Callum for an entire night at a time without having his precious, complicated, complex fraud that he spent his entire life crafting and concocting coming crashing down around him. Rape, ladies and gentlemen, is not a spectator sport.

(DE214:30).  The prosecutor's argument that Callum was not a spectator, but rather, an integral part of Flanders' scheme hardly prejudiced Flanders, and indeed, neither he nor Callum objected.  Given the virtually identical testimony from seven victims that Flanders lied to them, drugged them, and filmed Callum sexually assaulting them, this comment was not the turning point leading to Flanders' conviction.

## IV.    The Court Did Not Abuse its Discretion in Admitting Evidence.

### A.    Internet Searches and Drugs

The government introduced evidence that computers seized from Flanders' home in 2011 contained internet searches such as "Roofiepicsofpassedoutgirls," "passedoutgirlgetsfucked" and "sleepfucks" (DE213:71-74,82-87,96-99,110-18), and that in 2007, officers searching his home found not only victims' pornographic videos, but also Diazepam pills (DE210:295-301).[25]

Flanders argues that the internet searches were not relevant because the computers were owned, and could have been accessed, by someone else, and the

---

[25]    Flanders preserved objections to this evidence (DE63,65,79; DE210:14-16,299; DE213:82-83,96,121).  However, Flanders did not move in limine to exclude Clonazepam pills found in 2011, he did not object at trial (DE212:172-73), and although he mentions them in passing (FlandersBr:31), he has not demonstrated plain error in light of overwhelming evidence that he drugged the victims.  In any event, our argument regarding the Diazepam seized from his residence in 2007 applies equally to the Clonazepam seized in 2011.

evidence was unduly prejudicial (FlandersBr:27-31).[26] Flanders similarly argues that it was error to introduce the drugs found in 2007 because he did not have exclusive access to the bathroom where the drugs were found, and there was no evidence of constructive possession.  These arguments misconstrue the evidence and the law.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

The online searches for sex with unconscious women demonstrated either that Flanders was conducting research for his scheme, which relied on the sexual performances of drugged women, or that he enjoyed such images, providing a powerful motive for his crimes.  In either case, the evidence was relevant. *United States v. Thomas*, 242 F.3d 1028, 1033n.7 (11th Cir. 2001) (in felon-in-possession case, evidence of defendant's drug dealing proves motive for possessing firearms).

Likewise, the Diazepam pills found in July 2007 were relevant.  Diazepam is a type of Benzodiazepine (DE210:301), and its presence in Flanders' home, secreted in a bottle marked for codeine, is probative evidence that Flanders had access to

---

[26]     Callum joined in Flanders' motion at trial (DE210:16), and he now argues that this evidence was unduly prejudicial (CallumBr:19-22), but this evidence pertained only to Flanders, and the court instructed the jury to consider the evidence separately as to each defendant (DE214:103).

Benzodiazepines during the conspiracy. *United States v. Lopez*, 271 F.3d 472, 485-86 (3rd Cir. 2001). Ms.Bray (drugged in November 2006) and Ms.Caldwell (drugged in June 2007), tested positive for Benzodiazepines generally. That Flanders had access to Benzodiazepines just one month after Ms.Caldwell was drugged tends to make more probable the fact that Flanders drugged her with Benzodiazepines. Surely, had the officers *not* found Benzodiazepines in Flanders' home, he would have argued that their absence was relevant to proving the victims were lying.

Equally fruitless is Flanders' argument that the evidence was not relevant because others living with him could have used the computers or possessed the pills. There was no evidence as to who owned the computers found in the residence Flanders shared with his girlfriend. But computer analysis showed that Flanders' email was used and someone logged into the computers and conducted hundreds of searches of Modelmayhem, Blackplanet, and Olympicmodels and for images of sex with unconscious women (DE213:55-99,110-21; DE210:307; DE212:185; DE213:261-62). The jury was entitled to infer that Flanders, not his girlfriend, conducted these searches, especially since they were conducted at times when Flanders' girlfriend was working (DE213:247; GX170,192). Moreover, Flanders' argument does not make the evidence less relevant, but instead goes to its weight. *Lopez*, 271 F.3d at 485-86. Flanders fully explored this issue on cross-examination

63

and argued to the jury that his shared residence vitiated the significance of the Diazepam and online searches.  In any event, given the overwhelming evidence that Flanders defrauded and drugged the women, any error in the admission was harmless.

Similarly erroneous is Flanders' constructive possession argument. Constructive possession, whether exclusive or joint, exists when a defendant has ownership, dominion, or control over an object or the premises where the object is found. *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989).  As to the Diazapam pills, the evidence established that Flanders lived at the residence along with two adult relatives and stored pornographic videos of victims in his bedroom. The Diazepam pills, concealed in a pill bottle in a shared bathroom, permitted the inference that Flanders was in joint constructive possession of the drugs.  The argument is the same as to the computers, as evidenced by the use of Flanders' email addresses (GX191).  However, even if the inferences of constructive possession were unwarranted, any error in the admission was harmless given the overwhelming evidence.

Flanders' additional contention that evidence of the online searches unduly prejudiced him is unpersuasive in light of the gravity and severity of the other evidence.  "In criminal trials relevant evidence is inherently prejudicial" and Fed.R.Evid. 403 is an extraordinary remedy that "permits exclusion only when unfair

64

prejudice substantially outweighs probative value." *United States v. Merrill,* 513 F.3d 1293, 1301 (11th Cir. 2008). The term unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 650 (1997). Here, the jury already had heard the horrifying, lurid testimony from seven women whose lives were irrevocably altered when appellants preyed on their ambitions, drugged them, raped them, and left them confused, half-naked, limp, and sometimes bleeding. The risk that, in the face of this evidence, the jury's passions were inflamed, not by Flanders' conduct, but by online searches conducted in the privacy of his home, was insignificant.

### B.    Flanders' Post-Arrest Statements

Flanders erroneously argues that reading into evidence a transcript of his 2007 post-*Miranda* statements violated the "best evidence rule" (FlandersBr:31-32).

Flanders' 2007 post-*Miranda* statement was digitally recorded and transcribed. Det.Fletcher compared the transcription with the recording and concluded that it was accurate. Due to an unintentional error, the recording was not properly downloaded and no longer exists (DE211:292,302-04; DE212:47-50). The court overruled Flanders' best-evidence-rule-objection to the transcript, and it was published to the jury by reading it into the record, with the prosecutor reading questions and

65

Det.Fletcher reading answers. Flanders did not object to this publication method (DE211:304-19).

The best evidence rule requires the proponent to produce the original to prove the contents of a recording. *United States v. Howard,* 953 F.2d 610, 612 n.1 (11th Cir. 1992). An original is not required if it is lost or destroyed unless it is unavailable through bad faith. Fed.R.Evid. 1001, 1004. A duplicate is admissible to the same extent as an original, unless there is a genuine question of authenticity or it would be unfair to admit the duplicate. Fed.R.Evid. 1003. *United States v. Ross,* 33 F.3d 1507, 1513 (11th Cir. 1994) (rejecting best-evidence challenge to transcripts of destroyed recordings of co-conspirators' conversations).

Contrary to Flanders' assertion, the government did not have the audio-recording which, as Det.Fletcher testified, had been inadvertently destroyed, and therefore, the transcript was admissible. Other than Flanders' bald assertion, there is no evidence that the transcript was untrustworthy. Moreover, his newly-minted argument that the publication method prejudiced him should be rejected under the plain error standard.

### C.    2011 Search Warrant

Flanders argues, for the first time, that the 2011 search warrant affidavit was infirm because it was based on misrepresentations that the case involved children,

rendering all evidence seized inadmissible (FlandersBr:33-34; FlandersAppendix:Tab2). This argument was waived and rests on a fundamental misreading of the affidavit.

The government provided the search warrant affidavit in pretrial discovery, but Flanders did not move to suppress the search or otherwise challenge the affidavit's veracity, and he has waived any objection absent good cause, which he does not assert. Fed.R.Crim.P. 12(b)(3)(c),12(e); *United States v. Ford,* 34 F.3d 992, 994 n.2 (11th Cir. 1994).

In any event, he is simply wrong on the facts. The affidavit was *not* based on any allegations about children. Rather, the probable cause section shows that the warrant was sought based on what was done to adult women. The only reference to children was in S.A.Carpentieri's description of her investigative experience, in which she mentioned her experience investigating sexual assaults and child exploitation. Likewise baseless is his argument that the search warrant was somehow infirm because not all victims were interviewed. Putting aside that the government did not know all the victims at the time, no law requires a search warrant to be based on the allegations of all victims.

67

**V.     Appellants Were Not Denied a Public Trial.**

Callum erroneously argues that the public was denied access to closing arguments in violation of his Sixth Amendment right to a public trial and, therefore, that the court should have granted him a new trial (CallumBr:22-25).[27]

After the parties rested their cases on December 5, the judge announced in open court that closings would begin promptly at 9:00 the following morning. By 9:00 on December 6, the courtroom was "nearly full" of spectators, "[w]ith the exception of the first row behind defense counsel, where for safety reasons, the U.S. Marshals Service does not permit anyone to sit" (DE142:2,n.1). Just before 9:00, the court informed the parties and spectators that, to maintain order and prevent distraction, the doors would be locked during closings (DE142:2). No one objected, and at approximately 9:05, the doors were locked, and the parties proceeded with closings (DE142:4-5).

After closings concluded, appellants' attorneys informed the court that several of appellants' friends/family had arrived after the doors were locked and were unable to witness closings, and one relative had exited just after 9:00 and could not reenter. Although the attorneys had not objected when the court proposed to lock the

---

[27]     Our argument applies equally to Flanders, who generally adopted Callum's brief (FlandersBr:73).

68

courtroom, and although there would not have been enough seats to accommodate all the individuals who were unable to view the closings (DE142:2n.3), the court nevertheless offered defense counsel the opportunity to repeat closings with the courtroom unlocked. Both attorneys declined (DE214:76-81).

The next day, just before the verdicts, defense counsel moved for a mistrial on Sixth Amendment grounds (DE215:8-13). The court denied the motion, finding that there was no contemporaneous objection, defense counsel had declined the court's offer to repeat closings, appellants' family/friends were not excluded but failed to arrive on time or remain in the courtroom as instructed, the courtroom was nearly full, a number of appellants' supporters were present for closings, and they had not identified any prejudice (DE215:14). The court later denied appellants' motions for new trial based on the same claims (DE139-42). This was not an abuse of discretion.

The Sixth Amendment public trial guarantee ensures that the trial is fair, discourages perjury, and ensures that judges, prosecutors and witnesses carry out their respective duties with a keen sense of the importance of their functions. *Waller v. Georgia*, 467 U.S. 39, 46, 104 S. Ct. 2210, 2215 (1984) (error to completely exclude public from suppression hearing); *Presley v. Georgia*, 558 U.S. 209, 213, 130 S. Ct. 721, 724 (2010) (error to completely exclude public during jury selection). The public trial right is not absolute and sometimes must yield to other interests, such as

69

those essential to the administration of justice. *Waller*, 467 U.S. at 45, 104 S. Ct. 2215.

Even assuming that a complete closure during closing arguments would implicate the Sixth Amendment, a partial closure does not engender the same fairness and secrecy concerns. *Douglas v. Wainwright*, 739 F.2d 531, 532 (11th Cir. 1984). *Judd v. Haley*, 250 F.3d 1308, 1315-16 (11th Cir. 2001) (distinguishing between a partial closure, which occurs when public access is restricted in some fashion but is retained by some spectators, with full closure, which occurs when the public is specifically excluded).

Here, there was no closure at all, or at most only a partial closure. The public was not denied access to the courtroom during closings; rather, the public was permitted complete access with the proviso that they arrive on time. Many of appellants' friends/family were present, and the remainders' failure to either arrive on time or remain in the courtroom after 9:00, constituted a voluntary action of their own choosing rather than an involuntary exclusion as a result of the court's restrictions. The public was present throughout trial, including closing arguments, and appellants "still received the safeguards of the public trial guarantee." *Douglas,* 739 F.2d at 532-33. They did not raise a timely objection or accept the court's offered remedy. They should not now be heard to complain.

70

## VI.    Flanders' Ineffective Assistance Argument Should Not Be Considered.

Usually, the record is inadequate to evaluate ineffective-assistance claims on direct appeal because the trial evidence was devoted to guilt-or-innocence issues, as opposed to the reasoning behind counsel's actions, and the record "may contain no evidence of alleged errors of omission, much less the reasons underlying them." *Massaro v. United States,* 538 U.S. 500, 504-05, 123 S.Ct. 1690, 1694 (2003). Accordingly, an ineffective-assistance claim is more properly raised via collateral attack.

Flanders raises numerous ineffectiveness allegations, spanning pretrial, trial, and sentencing proceedings (FlandersBr:56-64). The district court did not develop a factual record or rule on these allegations. It is not sufficient, as Flanders suggests, simply to point to numerous alleged errors, because there may have been legitimate reasons why counsel refrained from making certain arguments, not the least of which may be that they lacked merit. Because the record is not sufficiently developed, this Court should decline to address the merits.

## VII.    Flanders Was Not Entitled to Grand Jury Disclosure.

As noted above, Flanders did not raise arguments related to the grand jury before trial or in his motion for new trial. While represented by counsel, he filed *pro*

71

se pleadings raising concerns about the grand jury (DE148,202), but he did not raise the issue through counsel until months after sentencing when new appellate counsel moved for disclosure, stating that he "had been informed" that the grand jury may have been told that the sexual acts involved minors (DE261). The prosecutor responded, detailing the genesis of Flanders' allegations (DE264:2-6; *see* DE156), and arguing that Flanders had not met the stringent standards necessary to justify disclosure (DE264:9-11). The prosecutor represented that he had reviewed the grand jury transcripts and confirmed that no evidence relating to minors was presented (DE264:3n.2). In Flanders' reply, he noted that, at his initial appearance, the magistrate judge incorrectly stated that the charges involved minors, although he acknowledged that the government immediately corrected this misstatement (DE265:2; *see* DE103:2).

The court denied the motion, ruling that Flanders' contentions were insufficiently specific to show a compelling and particularized need for disclosure, and Flanders had not shown prejudice (DE268:4). The court rejected Flanders' claim that "'his pretrial services report and his booking sheet charged him with sexual exploitation of a minor,'" explaining that the documents contained merely a shorthand reference to §1591–entitled "Sex trafficking of children or by force, fraud, or coercion"–but this clerical error was not evidence that the grand jury was misled

72

into believing that Flanders had exploited children (DE268:4-5). The court also rejected Flanders' argument that the statutory language could have misled the grand jury even though the indictment it returned did not refer to minors (DE268:5). Contrary to Flanders' argument (FlandersBr:65-73,23-24), this was not an abuse of discretion.

A defendant must show a compelling and particularized need for disclosure of grand jury materials. *United States v. Procter&Gamble,* 356 U.S. 677, 682, 78 S.Ct. 983, 986 (1958); *United States v. Aisenberg,* 358 F.3d 1327, 1348 (11th Cir. 2004). Here, Flanders has shown only that certain pretrial documents used a shorthand reference to the statutory title and that a magistrate judge repeated this reference, which the government immediately corrected (DE103:2). As the district court explained, §1591 creates two categories of offenses relating to sex trafficking, one prohibiting trafficking in adults using force, fraud, or coercion, and the second prohibiting trafficking in minors. Flanders was charged with the former, and Flanders' "evidence" of fraud hardly casts doubt on the charges presented to the grand jury and falls far short of establishing a particularized and compelling need to

73

usurp traditional grand jury secrecy. As noted *supra* 55, the superseding indictment upon which he was tried refers only to adult pornography and women, not minors.[28]

The court's decision denying disclosure can be upheld for this reason alone. Nevertheless, there is an equally fundamental basis upon which to reject Flanders' quest for a remand to permit him to review the grand jury materials.

Flanders' argument seeks to pierce the veil of grand jury secrecy because he believes the indictment was fraudulently obtained. Flanders waived any challenge to the indictment, however, by not timely raising it. And even if he could establish that the grand jury was misled into believing the charges involved minors, he has not demonstrated prejudice required to warrant reversal.

Where improprieties in the grand jury are raised *before trial*, dismissal of the indictment is inappropriate unless the error "substantially influenced" the grand jury's decision to issue charges, or if grave doubt exists that the decision was free from such

---

[28]    Flanders also argues: (1) that he needs the grand jury transcripts because not all grand jury witnesses testified at trial, and he wants to know what they said (FlandersBr:66,n13); and (2) that there is no longer a need for secrecy because trial is over (FlandersBr:69,72). This, of course, is precisely the opposite of what the Jenck's Act requires. 18 U.S.C. §3500. The government is not required to provide transcripts of individuals who do not testify at trial, regardless of whether they testified before the grand jury, and the mere conclusion of trial does not extinguish grand jury secrecy. And of course, the fact that the government reviewed the transcripts (FlandersBr:67,71) is irrelevant since the grand jury secrecy requirement does not apply to the very government that impaneled the grand jury. Fed.R.Crim.P. 6(e).

influence. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 263, 108 S.Ct. 2369, 2378 (1988); *United States v. Exarhos*, 135 F.3d 723, 726 (11th Cir. 1998) (refusing to overturn indictment even though government presented forged documents). If, however, a petit jury subsequently convicts a defendant, "any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70-71, 106 S.Ct. 938, 941-42 (1986); *United States v. Navarro*, 608 F.3d 529, 539-40 (9th Cir. 2010) (citing Circuit opinions). Post-verdict, dismissal of the indictment is appropriate only where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia*, 487 U.S. at 257, 108 S.Ct. at 2374 (structural error includes race and gender bias in the selection of grand jurors).

Flanders' failure to raise the grand jury issue before the petit jury was sworn subjects him to the *Mechanik* standard, and his conviction renders harmless any alleged error or misconduct before the grand jury. Flanders was tried on an indictment that did not refer to minors, but instead referred to "adult" pornography and "women," and the petit jury heard testimony from seven adult females who stated their ages on the record. There was absolutely no evidence presented to the trial jury regarding minors, and therefore, the alleged errors are harmless beyond a reasonable

doubt. Accordingly, he cannot show that the court abused its discretion in denying disclosure.[29]

## VIII.  Appellants' Sentences Were Proper

### A.    Sentencing Proceedings

Using the 2011 Guidelines, probation calculated appellants' offense levels using multiple count rules. The guideline for Count 1 (§371 conspiracy) was §2X1.1(a), which directs the court to apply the base offense level ("BOL") from the guideline for the substantive offenses (§1591(a)), namely, §2G1.1, which normally provides a BOL of 14 (PSIs¶18). However, §2G1.1(c) required a cross-reference to §2A3.1 (Criminal Sexual Abuse) and a BOL of 30 because, in pertinent part, the offense involved conduct described in 18 U.S.C. §2241(b)(2), which prohibits a defendant from engaging in a sexual act with a person after secretly administering a drug which "substantially impairs" that person's ability "to appraise or control conduct."

---

[29]    Even if the more lenient *Bank of Nova Scotia* standard were applied, the result would be the same, as there is simply no support for the assertion that the grand jury was "substantially influenced" by alleged references to minors or that "grave doubt" exists that their decision was free of such influence.

The guideline for Count 13 (§1594(c) conspiracy) was §2X5.1, for which the most analogous guideline was §2G1.1, which, as before, required a cross-reference to §2A3.1 (PSIs¶18).

For Flanders' §841 drug convictions, §2D1.1 provided the BOL (FlandersPSI¶18), but grouping rules meant that the drug offenses did not affect the offense levels, and therefore, appellants' offense levels did not differ.

Because seven victims were involved, multiple count rules were applied, resulting in seven groups, with each group representing offenses related to a particular victim (PSIs¶¶19-21). The calculations for each group were identical.

For each victim, §2A3.1(a)(2) established a BOL of 30, which was enhanced four levels under §2A3.1(b)(1) because the offense involved conduct described in §2241(b), resulting in an adjusted offense level for each group of 34 (PSIs¶¶22-63).

After applying multiple count adjustments (PSIs¶¶64-73), the total offense level was 39 (PSIs¶¶74,77). Appellants had zero criminal history points and criminal history categories of I (PSIs¶80), resulting in an advisory guideline imprisonment range of 262-327 months (FlandersPSI¶115; CallumPSI¶118).

The statutory range for Count 1 and for Flanders' drug counts was 0-5 years, for Count 13 was any term of years to life, and for the substantive counts was 15 years to life (FlandersPSI¶114; CallumPSI¶117).

77

Both PSIs identified bases for upward departure, including §5K2.8, Extreme Conduct, which applies if the defendant's conduct was unusually heinous, cruel, or degrading to the victim (FlandersPSI¶¶125-26; CallumPSI¶¶128-29).

Flanders (DE145) and Callum (DE147) filed objections, and the government responded (DE153). The objections relevant to this appeal are discussed below.

The government moved for an upward departure pursuant to §5K2.8, or alternatively for an upward variance, to life imprisonment because appellants' conduct was unusually degrading and involved prolonging the victims' humiliation (DE149). Flanders moved for a downward variance (DE160), and objected to the government's departure motion (DE164), which Callum adopted (DE165).

At the sentencing hearing, the court overruled appellants' objections (DE217:7-28, adopted the advisory guideline range (DE217:28), and granted the government's request for an upward departure to life imprisonment (DE217:40-49). The court heard testimony from victims (DE217:49-60), denied Flanders' request for a downward variance (DE217:33-36), and concluded that life imprisonment was reasonable (DE217:80,83).

The court sentenced Callum to a total imprisonment term of life: 60-months for the §371 conspiracy and life imprisonment for each of the sex trafficking charges, to run consecutively to each other and to the 60-month term (DE217:83-85;

78

DE172,224).  The court likewise sentenced Flanders to a total imprisonment term of life: concurrent 60-month terms for the §371 conspiracy and drug counts, and life terms for each of the sex trafficking charges, to run consecutively to each other and to the 60-month term (DE217:80-82; DE170,239).  Appellants renewed their prior objections (DE217:82,85).

### B.    Sentencing Issues

In reviewing the reasonableness of a sentence, the Court first ensures that no procedural error occurred and then considers whether the sentence was substantively reasonable, examining the totality of the circumstances to determine whether the §3553(a) factors support the sentence. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007); *United States v. Gonzalez,* 550 F.3d 1319, 1323-24 (11th Cir. 2008).  The Court will not second-guess the weight that the sentencing judge accorded a factor and may not set aside a sentence merely  because it disagrees with it. *United States v. Irey*, 612 F.3d 1160, 1190-91 (11th Cir. 2010)*.*  The party challenging the sentence has the burden of establishing unreasonableness. *United States v. Talley,* 431 F.3d 784, 788 (11th Cir. 2005).

### 1.    Erroneous Citation to §2G1.3(d)

Flanders argues, for the first time, that the court erred in grouping pursuant to §2G1.3(d) (FlandersBr:12-13).  Flanders is correct that §2G1.3(d) is the grouping rule

for sexual offenses involving minors, whereas the correct grouping section for multiple victims is §2G1.1(d). The PSI's citation to §2G1.3(d) as the multiple count guideline likely was a typographical error because the language following the incorrect citation properly tracked §2G1.1(d) for multiple victims (FlandersPSI¶19). In any event, this error, whether true or typographical, did not effect Flanders' sentence as required to establish plain error. Both sections provide that victims be divided into separate groups, which is what the PSI did.

### 2. Cross-Reference

Callum argues that his BOL should not have been calculated using the cross-reference to §2A3.1 (CallumBr:15-18). The court correctly overruled this objection (DE217:9-10; DE145:3-5; DE147:2-5).[30]

Appellants violated §1591, for which the BOL generally is determined by reference to §2G1.1. However, §2G1.1(c) mandated that §2A3.1 be used because the offense involved conduct described in §2241(b)(2). The trial evidence established that, as part of appellants' fraudulent scheme, Flanders plied the victims with alcoholic drinks, which unbeknownst to them, were laced with Benzodiazepines–a date-rape drug that made them more compliant to instructions and erased their

---

[30]     *See* footnote 27.

memories. Because this conduct falls squarely within §2241(b), the cross-reference applied.

Callum tries to avoid this straightforward conclusion by raising a series of arguments that have little to do with the propriety of the cross-reference. He argues that the §1591 convictions were jurisdictionally defective because the government's theory at trial was that the sex act itself was the "thing of value" required for conviction. This, of course, was not the only thing of value appellants received. The evidence established that appellants lured women to South Florida, drugged them, and raped them, not out of some misguided sense of excitement, but because they were selling the video-footage of the victims' sexual assaults. The "thing of value" appellants received was the money they obtained from selling the victims' videos, whether personally or under an aiding/abetting theory. Callum's related suggestion that §1591 prohibits only interstate enticement for forced prostitution is unsupported and gratuitously eviscerates the remainder of the statute criminalizing sex trafficking *by fraud*.[31] Callum also argues that, because the §1591 convictions rested on fraud, not force or coercion, his actions lay outside the conduct proscribed by §2241(b). This argument misreads §2241. Only subsection (a) requires force or fear.

---

[31]    Callum relies on *United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010), but Frank was not prosecuted under §1591, and the case does not interpret §1591 much less limit it to interstate enticement for forced prostitution.

Subsection (b) does not.  In fact, the conduct proscribed by subsection (b) quite remarkably captures appellants' scheme–secretly administering date-rape drugs to women so they could film the women having sex while drugged.

### 3.    Double Counting

Appellants argue that the court engaged in impermissible "double counting" by applying the cross-reference to §2A3.1 in determining their BOL and also applying the four-level specific offense characteristic enhancement under §2A3.1(b)(1), because both were based on conduct described in §2241(b) (FlandersBr:13-14;CallumBr:16-17).  This argument misinterprets the guidelines (DE145:4; DE147:4).

Section 1B1.5(a) provides that "[a] cross reference (an instruction to apply another offense guideline) refers to the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions)."  The court faithfully followed these instructions in applying the §2G1.1(c) cross-reference, setting the BOL *and* applying specific offense characteristics in 2A3.1.

This was not impermissible double counting because the §2A3.1(b)(1) enhancement increased the punishment for a harm that was not accounted for in the §2A3.1(a)(2) BOL, which applies to offenses that do not necessarily involve the aggravating factors present in §2241(b).  For example, the §2A3.1 BOL applies to

82

sexual abuse under §2242, but sexual abuse does not necessarily involve the same aggravating circumstances as those described in §2241(a) (such as using force or threat to commit sexual act) or (b) (such as secretly using date-rape drug to commit sexual act). Those aggravating circumstances are not factored into the §2A3.1 BOL. The specific offense characteristic at §2A3.1(b)(1) is the vehicle for addressing aggravating circumstances so that offenses involving such conduct will be punished more severely. Thus, applying the §2A3.1 enhancement was not double counting because that adjustment addressed a harm not fully accounted for in setting the BOL. *United States v. Webb*, 665 F.3d 1380, 1382-83 (11th Cir. 2012) (cross-reference to firearm guideline included BOL and enhancements and did not constitute double counting); *United States v. Archdale*, 229 F.3d 861, 868-69 (9th Cir. 2000) (four-level enhancement for use of force in sexual abuse offense did not impermissibly double count the element of force, though force was the factor which triggered the cross-reference). These provisions are unambiguous, and therefore, resort to the rule of lenity as Flanders urges is inappropriate. *United States v. Camacho-Ibarquen*, 410 F.3d 1307, 1315 (11th Cir. 2005).

### 4.    Upward Departure

Flanders argues, for the first time, that the upward departure was improper because §2G1.1 comment. n.6 provides for an upward departure only when there are

83

more than ten victims (FlandersBr:16). He cites no law for the proposition that the application note's reference to ten victims somehow excludes all other bases for departure under 5K. Absent such a showing, there can be no "plain" error. *Henderson v. United States*, 133 S.Ct. 1121, 1131 (2013) (error is plain if it is clear at time of appellate review). Moreover, as the government proffered at sentencing, appellants' relevant conduct involved upwards of 50 victims, although only a few were included in the indictment (DE217:68-80; DE149:8).

Appellants' related claim (FlandersBr:16;CallumBr:13-14,18-19) that the §5K2.8 upward departure was unwarranted and unreasonable based on the facts likewise lacks merit (*see* DE217:40-49; DE145:5-6; DE147:5-6; DE164-65). The facts overwhelmingly supported the §5K2.8 departure, as the court concluded:

> [O]n the evidence that I heard and watched, this is squarely the type of case and evidence, and these are the defendants, that this provision was designed for and to apply to. I don't think we need to belabor the point. If ever there was a basis for an upward departure, this is the case, and accordingly, I will grant the government's motion.

(DE217:48-49). This was not error.

The government identified several bases for departure under §5K2.8, recounting in dreadful detail the victims' extreme degradation and prolonged humiliation (DE149). The video-recordings appellants produced and sold depict the most horrifying and shameful experiences of the victims' lives, yet because they were

84

drugged, the victims remembered little or nothing of the sexual encounters, despite appearing eerily awake and responsive.  Appellants relentlessly mocked the victims on camera and then left them alone, confused and disoriented, sometimes covered in their own vomit or urine and bleeding from their vaginas.  The true nature and extent of the victims' degradation was impossible to measure because video-recordings of sexual assaults will be available online virtually forever (DE217:42-44).

Because appellants' guideline ranges did not account for this perpetual and extreme form of degradation and humiliation, the §5K2.8 departure from the top of the guideline range (327 months) to life imprisonment, was appropriate.

### 5.    Substantive Reasonableness

Appellants argue that their life sentences were unwarranted (FlandersBr:18-19;CallumBr:18-19).  They have not met their burden of demonstrating that the district court abused its discretion in imposing life sentences to reflect the seriousness of the crimes, provide just punishment, and protect the public (DE217:80,83).

The life sentences reasonably reflect the seriousness of appellants' criminal conduct.  The trial evidence overwhelmingly established that, since 2006, Flanders spent countless hours stalking women online, fraudulently preying upon their dreams of winning lucrative modeling contracts, and luring them to an audition where he secretly spiked the alcohol he instructed them to drink with date-rape drugs.  On the

85

pretense of taking the women to meet the audition's "sub-contractor," Flanders took them to Callum and then filmed the drug-affected, semi-conscious, and memory-impaired women as Callum sexually assaulted them.

Callum's conduct was no less despicable, having sex, sometimes for hours on end, with the drugged women, often demonstrating a callous disregard for their well-being. Indeed, when, towards the end of the movie "MonkeyHumpin'#1," Ms.Tyler passed out on Callum's sofa, Callum, with Flanders filming, ejaculated, not onto her face (as he did at the end of all his movies), but on her stomach, so that the fact that she was unconscious would not be captured on camera. And, in the movie "My MommyDon'tKnowI'maHoe," Callum so forcefully penetrated Ms.Bray, who was then a virgin, that she began to bleed profusely from her vagina. Then, as if these protracted and degrading acts of sexual assault were not enough, Callum produced, edited, and distributed the video-recordings.

The life sentences also more fully reflect the scheme than the guideline range which, because of multiple victim and grouping rules, accounted for only five of the seven victims who testified at trial. Moreover, since 2006, approximately 50 women reported that they had been drugged and raped by appellants in a manner virtually identical to the trial victims (DE217:68-80; DE149:8). Therefore, the life sentences more accurately represent the true breadth of appellants' crimes. Likewise, the life

86

sentences accounted for the perpetual and indefinite degradation caused by the widespread dissemination of the victims' pornographic videos on the internet, which otherwise was not accounted for in the guideline range.

The life sentences appropriately send a strong message condemning the evil acts of degradation that appellants repeatedly perpetrated on innocent victims and were necessary to incapacitate and protect the public from appellants' criminal proclivities and lewd and greedy predilections. Not only did appellants engage in a multi-year course of conduct that was both heinous and dangerous, but they continued to commit these acts for years while on state bond, a strong indication that they would not abide by future release conditions nor conform their conduct to any semblance of a law-abiding standard. Moreover, at sentencing, as throughout trial, the defense attempted to blame the victims, drawing the ire of the district court (DE217:48), and lending credence to the conclusion that appellants, even after their convictions, did not fully appreciate the seriousness of their conduct and would be a danger to the community if released.

### 6.    Downward Variance

Flanders argues that the guideline ranges for sexual offenses far exceed those for other, more serious crimes (FlandersBr:14-16). The district court rejected his argument, as should this Court (DE217:30-36; DE160).

87

This was a serious, indeed monstrous, offense. Flanders preyed on women, using ingenious ruses to instill trust, all the while intending to drug them so they could be sexually assaulted and filmed for profit. The women have been terrorized both physically and emotionally, despite Flanders oft-repeated arguments that they were only raped once and that sex trafficking statutes most often are used to combat forced prostitution. Congress authorized a life sentence, and Flanders' attempt to minimize his conduct by claiming that it was not as serious as offenses involving firearms or drugs and did not physically or emotionally harm the women should fall on deaf ears. The district court appropriately considered the §3553(a) factors, as discussed above, and strongly rejected Flanders' attempt to characterize his offense as not that bad. Its decision should not be overturned based on Flanders' self-serving opinion that other offenses are more serious. *Irey*, 612 F.3d at 1190-91.

### 7.    **Consecutive Life Sentences**

Flanders argues, for the first time, that the consecutive life sentences were substantively unreasonable and violate the Eighth Amendment (FlandersBr:16-18). Flanders has not shown that the district court committed an "obvious" error under current law. Congress authorized life imprisonment for the sex-crimes at issue, and its decision that such offenses merit harsh punishment is entitled to substantial deference. Sex trafficking for profit is one of the most reprehensible offenses

88

imaginable. *United States v. McGarity*, 669 F.3d 1218, 1256-57 (11th Cir. 2012) (upholding life sentences for defendants who participated in child pornography ring); *United States v. Evans,* 476 F.3d 1176, 1179 (11th Cir. 2007) (In enacting §1591, Congress recognized that human trafficking, particularly of women and children in the sex industry, "is a modern form of slavery, and it is the largest manifestation of slavery today."); *United States v. Moriarty*, 429 F.3d 1012, 1024 (11th Cir. 2005) ("In general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual.").  Life sentences are severe, but not unusual. *Harmelin v. Michigan*, 501 U.S. 957, 994-95, 111 S.Ct. 2680, 2701-02 (1991);  *United States v. Yousef*, 327 F.3d 56, 163-64 (2nd Cir. 2003) (even sentences that exceed defendant's conceivable life expectancy do not violate Eighth Amendment).

A life sentence was a statutorily-authorized possibility for a single count. Given the narrow bounds of the Eighth Amendment in non-capital cases, Flanders has presented nothing to indicate that the court's decision to impose consecutive sentences in a multiple count/multiple victim case was an "obvious" error. *Harmelin*, 501 U.S. at 1001, 111 S.Ct. at 2705; *United States v. Farley,* 607 F.3d 1294, 1343 (11th Cir. 2010) (This Court "has never found a term of imprisonment to violate the Eighth Amendment, and outside the special category of juvenile offenders the Supreme Court has found only one to do so.").

89

Flanders' claim that his sentence does not reflect "mercy and compassion" is a far cry from demonstrating that his sentence is either grossly disproportionate or unreasonable. Under 18 U.S.C. §3584(b), the court had authority, after considering §3553(a) factors, to impose consecutive sentences. *United States v. Covington,* 565 F.3d 1336, 1346-47 (11th Cir. 2009). As the prosecutor's proffer at sentencing showed, appellants victimized at least 50 women, only seven of whom testified at trial to appellants' abhorrent conduct.

The video-footage revealed a stunning level of callousness, with appellants laughing at the victims as they were raped. For example, they laughingly told Ms.Tyler that they "loved her look," a reference to one of the first emails she had received from "Shannon," a false identity Flanders assumed in order to lure her to Miami under the fraudulent pretense of a modeling audition (DE50A); they giggled at Ms.Smith for looking up at the camera and "say[ing] hey to Karen"–"Karen" being the fake identity Flanders had created to lure her to South Florida–and then laughed when, after Callum ejaculated on her face, Ms.Smith could not keep herself awake (GX50C); they mocked Ms.Heron for never having "sucked dick before," and told her, just as Callum was ejaculating on her face, to pretend that Callum was her boyfriend (GX190B); and, most despicably perhaps, they laughed at Ms.Bray's virginity–a woman who had just turned nineteen–as, unbeknownst to her, Callum's

90

semen dripped down the front of her face and hung from her chin (DE164). The consecutive life sentences appropriately reflect this conduct and provide strong deterrence to others contemplating similar crimes.

Finally, it is unclear what prejudice Flanders believes he has suffered inasmuch as a resentencing to concurrent, rather than consecutive, terms would not alter his actual sentence.

### 8.    Double Jeopardy

Appellants argue that double jeopardy bars sentencing them for both §1591(a)(1) and (a)(2) (CallumBr:14-15;FlandersBr:12n.2). The court correctly rejected this argument (DE217:16-19; DE145:1-2; DE147:2).

An indictment is multiplicitous if it charges a single offense in more than one count, and separate sentences resulting from multiplicitous counts violate double jeopardy. *United States v. Mastrangelo,* 733 F.2d 793, 800 (11th Cir. 1984). To determine whether Congress intended to authorize separate punishments for the same conduct, the test is "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182 (1932); *United States v. Bobb*, 577 F.3d 1366, 1372 (11th Cir. 2009).

91

Here, the §1591(a)(1) counts required proof that each appellant *personally* enticed women by fraud to engage in commercial sex acts, while the §1591(a)(2) counts required proof that each appellant *participated in a venture that benefitted financially* from that fraud. Thus, the §1591(a)(2) counts required proof of two things not required for the §1591(a)(1) counts–financial benefit and participation in a venture as defined in §1591(e)(5). The counts, therefore, charge separate conduct as required to avoid multiplicity and double jeopardy concerns. *United States v. Moss*, 379 Fed.Appx. 651, 653 (9th Cir. 2010) (defendant may be charged and punished for conduct relating to the same victim under both §§1591(a)(1) and (2)).

## IX.    Flanders' Forfeiture Appeal Should Be Dismissed.

Flanders' *pro se* criminal forfeiture appeal should be dismissed because it is untimely and the arguments are not related to the forfeiture, but are additional merits arguments.

The court issued a final order of criminal forfeiture on August 28, 2012 (DE263). Flanders filed a *pro se* notice of appeal, signed on September 20 and docketed on September 24 (DE266). Even assuming that the notice was placed in the prison mail the day it was signed, it was outside the 14-days for appealing a criminal order. Fed.R.App.P. 4(b)(1)(A)(i), 4(c)(1); *Williams v. McNeil,* 557 F.3d 1287, 1290

n.2 (11th Cir. 2009) (prison mailbox rule). The Rule 4(b) time limit is not jurisdictional, but where the "government raises the issue of timeliness, as it has done here, this Court 'must apply the time limits of Rule 4(b).'" *United States v. Masilotti*, 495 Fed.Appx. 975, 980 n.3 (11th Cir. 2012) (citation omitted).

Although this Court may treat a notice of appeal filed less than 30 days late as a motion for extension of time under Rule 4(b)(4) and may remand to the district court for a good cause or excusable neglect determination, it should not do so here. In his *pro se* brief, Flanders raises five issues purportedly attacking the forfeiture order: (1) "Whether the trial court had jurisdiction over the alleged state conduct for indictment and the seizure of property"; (2) "Whether there was criminal misconduct of the Government and local police securing the indictment and the search warrant that led to the seizure of property"; (3) Whether FBI Agent Aleix Carpenter [sic] lied to Judge Ted E. Banstra [sic] in her application for a serach [sic] warrant"; (4) "Whether FBI had probable cause to search and seize the property from the home of Lucenda Roper"; and (5) "Whether a showing of warrant of jurisdiction in the District Court is a non-frivolous issue correctable on forfiture [sic] appeal under Fed.R.Crim.P. 52(b)" (Flanders*ProSe*Br:III).

None constitutes a proper attack on the forfeiture order; Flanders raises no issue with the procedural or substantive aspects of the forfeiture itself. Instead,

93

Flanders attacks the merits of the case as a reason to vacate the forfeiture.  This is an

improper attempt to file a duplicate merits brief.  This Court should not countenance

Flanders' nominal use of a forfeiture appeal to argue the merits when he already has

filed a counseled merits brief challenging every aspect of his case from pretrial, to

trial, to sentencing.  The Court's rules provide that "[w]hen a party is represented by

counsel, the clerk may not accept a brief from the party." 11thCir.R. 28-4.  *Tarter v.*

*Hury*, 646 F.2d 1010, 1014 (5th Cir. UnitA 1981) (approving refusal to docket *pro*

*se* motions of criminal defendants represented by counsel).  Although the Court

applies less stringent standards to *pro se* parties, they still must brief the issues and

reasonably comply with Fed.R.App.P. 28. *Grant v. Cuellar*, 59 F.3d 523, 524 (5th

Cir. 1995).  Moreover, this liberal construction "does not give a court license to serve

as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order

to sustain an action." *GJR Invs. v. Country of Escambia, Fla.,* 132 F.3d 1359, 1369

(11th Cir. 1998), *overruled on other grounds*, 129 S.Ct. 1937 (2009).  Flanders'

forfeiture brief lacks any discernable basis to challenge the forfeiture and  should be

dismissed. *Anderson v. Hardman*, 241 F.3d 544, 545-46 (7th Cir. 2001) (appeal

dismissed where court could not discern cogent arguments in *pro se* appellate brief).

**Conclusion**

For the foregoing reasons, the district court's decision should be affirmed.

Respectfully submitted,

Wifredo A. Ferrer
United States Attorney

By:    /s/ Lisa Tobin Rubio
Lisa Tobin Rubio
Assistant United States Attorney
99 N.E. 4th Street, 514
Miami, Florida  33132-2111
(305) 961-9114
Email: lisa.rubio@usdoj.gov

Kathleen M. Salyer
Chief, Appellate Division

Emily M. Smachetti
Assistant United States Attorney

Of Counsel

95

**Certificate of Compliance**

This brief complies with the type-volume limitation approved by order of this Court, granting the government's motion for oversized brief, not in excess of 20,000 words.  This brief contains  19,964  words, excluding the parts of the brief exempted by Fed. R. App. P.  32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-based typeface using Corel Word Perfect X5, 14-point Times New Roman.

**Certificate of Service**

I hereby certify that an original and 7 copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 20th day of June 2013, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF to David Joffe. Also on that same day it was mailed via United States mail to non CM/ECF participants, Derek Lewis, P.O. Box 612973, Miami, Florida 33261, and Lavont Flanders, pro se, USP Tucson, PO Box 24550, Tucson, Arizona, 85734.

/s/ Lisa Tobin Rubio
Lisa Tobin Rubio
Assistant United States Attorney

*ms*

97